RECEIVED

1  ALLEN HYMAN, ESQ. (CBN: 73371)
   LAW OFFICES OF ALLEN HYMAN
2  10737 Riverside Drive
   North Hollywood, California 91602
3  T: (818) 763-6289
   F: (818) 763-4676
4  Email: lawoffah@aol.com

5  JAMES V. CALTAGIRONE, ESQ. (Bar No. 136233)
   LAW OFFICES OF JAMES V. CALTAGIRONE
6  111 S. Moody Avenue
   Tampa, Florida 33609
7  T: (813) 251-3341
   E: caltagironelaw@aol.com

8
   Attorneys for Plaintiffs
9

10
                    UNITED STATES DISTRICT COURT
11
                    MIDDLE DISTRICT OF FLORIDA
12

13  MICHAEL MCGEE, an Individual;  )   Case No. 8:11-CV-1091-T-30TBM
    REMA MCGEE, an Individual;     )
14  ROBERT J. RYAN, an Individual; )   COMPLAINT NO. 3
    DAVID E. SCHEUERMAN, an        )
15  Individual; DAWN A. SCHEUERMAN,)   (1) VIOLATION OF FEDERAL
    an Individual; NANCY A.        )   SECURITIES LAWS, SECURITIES ACT
16  SCHEUERMAN, an Individual;     )   OF 1933(2)(1), 15 U.S.C.
    JOSEPH PAWLIK, JR., an         )   77(B)(1), SECURITIES EXCHANGE
17  Individual; KIMBERLY MURRAY, an)   ACT OF 1934 3(A)(10 15),
    Individual; SCOTT MURRAY, an   )   U.S.C.A. 78(C)(A)(10)
18  Individual; VICKY POHL, an     )   (2) VIOLATION OF THE INTERSTATE
    Individual; KEVIN POHL, an     )   LAND SALE ACT 15 U.S.C. 1701
19  Individual; DANIEL REMUS, an   )   (3) RICO
    Individual; DAVID J. REMUS, an )   (4) FRAUD (INTENTIONAL
20  Individual; DAYLEN REMUS, an   )   MISREPRESENTATION)
    Individual; TIFFANY REMUS, an  )   (5) FRAUD (CONCEALMENT)
21  Individual; HAL HAMPTON, an    )   (6) CONSPIRACY TO COMMIT FRAUD
    Individual; LOURDES HAMPTON, an)   (7) PROFESSIONAL NEGLIGENCE; AND
22  Individual; IAN B. CURRIE, an  )   (8) CONSTRUCTIVE TRUST
    Individual; MELISSA CURRIE, an )
23  Individual; VI-C INVESTORS,    )   [JURY TRIAL DEMANDED]
    LLC; KURT M. ZURAWSKI, an      )
24  Individual; REBECCA L. GRAEBER,)   [TO BE DOCKETED BEFORE THE
    an Individual; TERESA          )   HON. JAMES D. WHITMORE (ORDER
25  NISIVOCCIA, an Individual;     )   #159, 8:09-cv-02543-JDW-TGW)]
    DAVID NISIVOCCIA, an           )
26  Individual; KEVIN HUNTER, an   )
    Individual; JOHN JORDAN, JR.,  )
27  an Individual; TERI JORDAN, an )
    Individual; LUCY D. GREENE, an )
28  Individual; DAVID GOETTGE, an  )
                                   )

11 MAY 17 PM 12:00

CLERK _____ COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

```
 1 │ Individual; LYNN E. STEVENSON,  )
   │ an Individual; JOHN STEVENSON,  )
 2 │ an Individual; LORI WALLER, an  )
   │ Individual; SARIT NETANEL, an   )
 3 │ Individual; ERAN NETANEL, an    )
   │ Individual; CLARK BLACKWOOD, an )
 4 │ Individual dba BFS EAGLE LLC;   )
   │ ANDREW M. CRIPE, an Individual; )
 5 │ KRISTI CRIPE, an Individual;    )
   │ VYTAS ANKAITIS, an Individual;  )
 6 │ MARILEE ANKAITIS, an            )
   │ Individual; RANDALL RICHARDS,   )
 7 │ an Individual; JAMES WALKER, an )
   │ individual; and ANNIE M.        )
 8 │ WALKER, an individual,          )
   │                                 )
 9 │            Plaintiffs,          )
   │                                 )
10 │ v.                              )
   │                                 )
11 │ S-BAY DEVELOPMENT, LLC, a       )
   │ Florida Limited Liability       )
12 │ Company; SUNVEST RESORTS        )
   │ COMMUNITIES LLC, a Florida      )
13 │ Limited Liability Company; GSJV )
   │ MIG LLC, a Florida Limited      )
14 │ Liability Company; HARRIS       )
   │ FRIEDMAN an Individual; HARVEY  )
15 │ BIRDMAN, an Individual; HERBERT )
   │ HIRSCH, an Individual; HARVEY   )
16 │ BIRDMAN REVOCABLE TRUST, an     )
   │ Entity Unknown; DIANE S.        )
17 │ BIRDMAN, an Individual; DIANE   )
   │ S. BIRDMAN REVOCABLE TRUST, an  )
18 │ Entity Unknown; LOUIS BIRDMAN,  )
   │ an Individual; LOUIS BIRDMAN    )
19 │ REVOCABLE TRUST, an entity      )
   │ unknown; BONITA HIRSCH, an      )
20 │ Individual; BONITA HIRSCH       )
   │ REVOCABLE TRUST, an Entity      )
21 │ Unknown; JDI TAVASTA LLC, an    )
   │ Illinois Limited Liability      )
22 │ Company; JEFFREY AEDER, an      )
   │ individual; KEVIN CONNER, an    )
23 │ individual; COLONIAL BANCGROUP, )
   │ INC., an Alabama Corporation;   )
24 │ DAVID W. SCHWARZ, an            )
   │ Individual; IMGA Academies,     )
25 │ LLC, a Florida limited          )
   │ liability company, and DAVID    )
26 │ BAND, an individual,            )
   │                                 )
27 │            Defendants.          )
   │ _____)
28 │
```

1       Forty-two (42) Plaintiffs: Michael McGee ("M. McGEE"),

2 Rema McGee ("R. McGEE"), Robert J. Ryan ("RYAN"), David E.

3 Scheuerman ("D. E. SCHEUERMAN"), Dawn A. Scheuerman ("D. A.

4 SCHEUERMAN"), Nancy A. Scheuerman ("N. SCHEUERMAN"), Joseph Pawlik,

5 Jr. ("PAWLIK"), Kimberly Murray ("K. MURRAY"), Scott Murray ("S.

6 MURRAY"), Vicky Pohl ("V. POHL"), Kevin Pohl ("K. POHL"), Daniel

7 Remus ("DAN REMUS"), David J. Remus ("D. J. REMUS"), Daylen Remus

8 ("D. REMUS"), Tiffany Remus ("T. REMUS"), Hal Hampton ("H.

9 HAMPTON"), Lourdes Hampton ("L. HAMPTON"), Ian B. Currie ("I.

10 CURRIE"), Melissa Currie ("M. CURRIE"), VI-C Investors ("VI-C"),

11 Kurt M. Zurawski ("ZURAWSKI"), Rebecca L. Graeber ("GRAEBER"),

12 Teresa Nisivoccia ("T. NISIVOCCIA"), David Nisivoccia ("D.

13 NISIVOCCIA"), Kevin Hunter ("HUNTER"), John Jordan, Jr. ("J.

14 JORDAN"), Teri Jordan ("T. JORDAN"), Lucy D. Greene ("GREENE"),

15 David Goettge ("GOETTGE"), Lynn E. Stevenson ("L. STEVENSON"), John

16 Stevenson ("J. STEVENSON"), Lori Waller ("WALLER"), Sarit Netanel

17 ("S. NETANEL"), Eran Netanel ("E. NETANEL"), Clark Blackwood, dba

18 BFS Eagle LLC ("BFS EAGLE"), Andrew M. Cripe ("A. CRIPE"), Kristi

19 Cripe ("K. CRIPE"), Vytas Ankaitis ("V. ANKAITIS"), Marilee

20 Ankaitis ("M. ANKAITIS"); Randall Richards ("RICHARDS"); James

21 Walker ("J. WALKER"), and Annie M. Walker ("A. WALKER"),

22 (collectively, "PLAINTIFFS"), allege as follows:

23         **JURISDICTION**

24      1.   This Court has original jurisdiction pursuant to 28

25 U.S.C. § 1331. This complaint alleges violations under Section

26 10(b) of the Securities Exchange Act, 15 U.S.C., §§ 78j(b) and

27 78t(a), violations pursuant to 18 U.S.C. § 1964(c), under the

28 Racketeer Influenced and Corrupt Organizations Act ("RICO"), and

1   original jurisdiction pursuant to 15 U.S.C. § 1719 in that

2   PLAINTIFFS claims also arise under the Interstate Land Sales Act,

3   15 U.S.C. § 1701 et seq. This Court should appropriately exercise

4   its supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the

5   state law and common law claims, in that they arise out of the same

6   facts and circumstances as the federal claims.

7           2.    Venue is appropriate pursuant to 28 U.S.C. §

8   1391(b)(2), in that the Middle District of Florida is the judicial

9   district "...in which a substantial part of the events or omissions

10  giving rise to the claim occurred...," and where "...a substantial

11  part of the property that is the subject of the action is

12  situated."

13              **The PLAINTIFFS, The Purchasers of the Units**

14          3.    Plaintiffs, MICHAEL McGEE and REMA McGEE, are

15  individuals who are residents of San Jose, California, and are the

16  owners of the real property commonly known as Unit No. S-619,

17  located at 7150 N. Tamiami Trail, Sarasota, Florida.

18          4.    Plaintiff, ROBERT J. RYAN, is an individual who is a

19  resident of Berkeley, California, and is the owner of the real

20  property commonly known as Unit Nos. N-410 and N-412, located at

21  7150 N. Tamiami Trail, Sarasota, Florida.

22          5.    Plaintiffs, DAVID E. SCHEUERMAN and DAWN A.

23  SCHEUERMAN are individuals who are residents of Wheeling, Illinois,

24  and are the owners of the real property commonly known as Unit Nos.

25  C-110 and C-112 located at 7150 N. Tamiami Trail, Sarasota,

26  Florida.

27          6.    Plaintiff, NANCY A. SCHEUERMAN, is an individual who

28  is a resident of Schaumburg, Illinois, and is the owner of the real

1   property commonly known as Unit No. C-112, located at 7150 N.

2   Tamiami Trail, Sarasota, Florida.

3         7.   Plaintiff, JOSEPH PAWLIK, Jr., is an individual who

4   is a resident of Norridge, Illinois, and is the owner of the real

5   property commonly known as Unit No. C-112, located at 7150 N.

6   Tamiami Trail, Sarasota, Florida.

7         8.   Plaintiffs, KIMBERLY MURRAY and SCOTT MURRAY, are

8   individuals who are residents of Whitmore Lake, Michigan, and are

9   the owners of the real property commonly known as Unit No. C-110,

10  located at 7150 N. Tamiami Trail, Sarasota, Florida.

11        9.   Plaintiffs, VICKY POHL and KEVIN POHL, are

12  individuals who are residents of Salt Lake City, Utah, and are the

13  owners of the real property commonly known as Unit No. N-408,

14  located at 7150 N. Tamiami Trail, Sarasota, Florida.

15       10.   Plaintiffs, DANIEL REMUS and DAVID J. REMUS, are

16  individuals who are residents of Kenosha, Washington, and are the

17  owners of the real property commonly known as Unit No. S-607,

18  located at 7150 N. Tamiami Trail, Sarasota, Florida.

19       11.   Plaintiffs, DAYLEN REMUS and TIFFANY REMUS, are

20  individuals who are residents of Fort Meyers, Florida, and are the

21  owners of the real property commonly known as Unit No. S-605,

22  located at 7150 N. Tamiami Trail, Sarasota, Florida.

23       12.   Plaintiffs, HAL HAMPTON and LOURDES HAMPTON, are

24  individuals who are residents of San Ramon, California, and are the

25  owners of the real property commonly known as Unit Nos. C-124 and

26  N-308, located at 7150 N. Tamiami Trail, Sarasota, Florida.

27       13.   Plaintiffs, IAN B. CURRIE and MELISSA CURRIE are

28  individuals who are residents of Phoenix, Arizona, and are the

1  owners of the real property commonly known as Unit No. S-519,
2  located at 7150 N. Tamiami Trail, Sarasota, Florida.

3       14.   VI-C INVESTORS is located in Bradenton, Florida, and
4  is the owner of the real property commonly known as Unit No. N-418,
5  located at 7150 N. Tamiami Trail, Sarasota, Florida.

6       15.   Plaintiff, KURT M. ZURAWSKI, is an individual who is
7  a resident of Port Huron, Michigan, and is the owner of the real
8  property commonly known as Unit No. C-203, located at 7150 N.
9  Tamiami Trail, Sarasota, Florida.

10       16.   Plaintiff, REBECCA L. GRAEBER, is an individual who
11  is a resident of Gulf Breeze, Florida, and is the owner of the real
12  property commonly known as Unit No. C-133, located at 7150 N.
13  Tamiami Trail, Sarasota, Florida.

14       17.   Plaintiffs, TERESA NISIVOCCIA and DAVID NISIVOCCIA
15  are individuals who are residents of Clearwater, Florida, and are
16  the owners of the real property commonly known as Unit No. C-100,
17  located at 7150 N. Tamiami Trail, Sarasota, Florida.

18       18.   Plaintiff, KEVIN HUNTER, is an individual who is a
19  resident of San Diego, California and is the owner of the real
20  property commonly known as Unit No. C-108, located at 7150 N.
21  Tamiami Trail, Sarasota, Florida.

22       19.   Plaintiffs, JOHN JORDAN, JR., and TERI JORDAN, are
23  individuals who are residents of Drexel Hill, Pennsylvania, and are
24  the owners of the real property commonly known as Unit No. C-120,
25  located at 7150 N. Tamiami Trail, Sarasota, Florida.

26       20.   Plaintiff, LUCY D. GREENE, is an individual who is a
27  resident of San Jose, California, and is the owner of the real
28  ///

1  property commonly known as Unit No. C-232, located at 7150 N.

2  Tamiami Trail, Sarasota, Florida.

3       21.  Plaintiff, DAVID GOETTGE, is an individual who is a

4  resident of Oakland, California, and is the owner of the real

5  property commonly known as Unit No. C-213, located at 7150 N.

6  Tamiami Trail, Sarasota, Florida.

7       22.  Plaintiffs, LYNN E. STEVENSON and JOHN STEVENSON,

8  are individuals who are residents of Longmont, Colorado, and are

9  the owners of the real property commonly known as Unit No. C-103,

10  located at 7150 N. Tamiami Trail, Sarasota, Florida.

11       23.  Plaintiff, LORI WALLER is an individual who is a

12  resident of San Diego, California, and is the owner of the real

13  property commonly known as Unit Nos. N-310 and N-312, located at

14  7150 N. Tamiami Trail, Sarasota, Florida.

15       24.  Plaintiffs, SARIT NETANEL and ERAN NETANEL, are

16  individuals who are residents of Belmont, California, and are the

17  owners of the real property commonly known as Unit No. C-114,

18  located at 7150 N. Tamiami Trail, Sarasota, Florida.

19       25.  Plaintiff, CLARK BLACKWOOD, is an individual who is

20  doing business as BFS EAGLE LLC, and who are residents resident of

21  Longmont, Colorado, and is the owner of the real property commonly

22  known as Unit No. S-527, located at 7150 N. Tamiami Trail,

23  Sarasota, Florida.

24       26.  Plaintiffs, ANDREW M. CRIPE and KRISTI CRIPE, are

25  residents of Carlsbad, California, and are the owners of the real

26  property commonly known as Unit No. S-507, located at 7150 N.

27  Tamiami Trail, Sarasota, Florida.

28  ///

27.   Plaintiffs, VYTAS ANKAITIS and MARILEE ANKAITIS, are individuals who are residents of Los Gatos, California, and are the owners of the real property commonly known as Unit No. C-129, located at 7150 N. Tamiami Trail, Sarasota, Florida.

28.   Plaintiff, RANDALL RICHARDS, is an individual who is a resident of Highlands Ranch, Colorado, and is the owner of the real property commonly known as Unit No. C-212, located at 7150 N. Tamiami Trail, Sarasota, Florida.

29.   Plaintiffs, J. WALKER and A. WALKER, are individuals who are residents of San Leandro, California, and are the owners of the real property located at 7150 N. Tamiami Trail, Sarasota, Florida.

### PURCHASING AND OWNER DEFENDANTS

30.   S Bay, LLC ("S BAY"), is a Florida limited liability company, which was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay Club subdivision.

31.   S-Bay Development LLC ("S-BD, LLC"), is a Florida limited liability company, which was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "SHARED elements" of the Sarasota Cay Club subdivision.

32.   Sunvest Resorts Communities LLC ("SUNVEST"), is a Florida limited liability company, which was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was

1  designated as the "common elements" of the Sarasota Cay Club

2  subdivision.

3      33.   GSJV MIG LLC ("GSJV"), is a Florida limited

4  liability company, which was involved in the creation (directly or

5  indirectly) and/or ownership of the Sarasota Cay Club condominium

6  subdivision, and/or took title to what was designated as the

7  "common elements" of the Sarasota Cay Club subdivision.

8      34.   Harris Friedman ("FRIEDMAN"), is a resident of the

9  State of Florida or Nevada, who was involved in the creation

10 (directly or indirectly) and/or ownership of the Sarasota Cay Club

11 condominium subdivision, and/or took title to what was designated

12 as the "common elements" of the Sarasota Cay Club subdivision.

13     35.   Harvey Birdman ("H-BIRDMAN"), is a resident of the

14 State of Florida or Nevada, who was involved in the creation

15 (directly or indirectly) and/or ownership of the Sarasota Cay Club

16 condominium subdivision, and/or took title to what was designated

17 as the "common elements" of the Sarasota Cay Club subdivision.

18     36.   Herbert Hirsch ("HIRSCH"), is a resident of the

19 State of Florida or Nevada, who was involved in the creation

20 (directly or indirectly) and/or ownership of the Sarasota Cay Club

21 condominium subdivision, and/or took title to what was designated

22 as the "common elements" of the Sarasota Cay Club subdivision.

23     37.   Harvey Birdman Revocable Trust ("HBRT"), is, upon

24 information and believe, an entity unknown, which was involved in

25 the creation (directly or indirectly) and/or ownership of the

26 Sarasota Cay Club condominium subdivision, and/or took title to

27 what was designated as the "common elements" of the Sarasota Cay

28 Club subdivision.

38. Diane S. Birdman ("D.S. BIRDMAN"), is a resident of the State of Florida or Nevada, who was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay Club subdivision.

39. Diane S. Birdman Revocable Trust ("DBRT"), is, upon information and belief, an entity unknown, which was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay Club subdivision.

40. Louis Birdman ("L. BIRDMAN"), is a resident of the State of Florida or Nevada, who was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay Club subdivision.

41. Louis Birdman Revocable Trust ("LBRT"), is, upon information and belief, an entity unknown, which was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay Club subdivision.

42. Bonita Hirsch ("B. HIRSCH"), is a resident of the State of Florida or Nevada, who was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay Club subdivision.

43.   Bonita Hirsch Revocable Trust ("BHRT"), is, upon information and belief, an entity unknown, which was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay Club subdivision.

44.   JDI Tavasta LLC, is an Illinois Limited Liability Company which was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay Club subdivision.

45.   Jeffrey Aeder ("AEDER"), is an Illinois resident who was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay club Condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay club subdivision.

46.   Kevin Conner ("CONNER") is an Illinois resident, who was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay club Condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay club subdivision.

47.   Colonial Bancgroup, Inc. ("COLONIAL") is a Florida corporation, which was involved in the creation (directly or indirectly) and/or ownership of the Sarasota Cay Club condominium subdivision, and/or took title to what was designated as the "common elements" of the Sarasota Cay Club subdivision.

48.   IMGA Academies ("IMGA"), is a Florida limited liability company, which was involved in the creation (directly or

1  indirectly) and/or ownership of the Sarasota Cay Club condominium
2  subdivision, and/or took title to what was designated as the
3  "common elements" of the Sarasota Cay Club subdivision.

4  49.  David S. Band ("BAND"), is a Florida resident who
5  was involved in the creation (directly or indirectly) and/or
6  ownership of the Sarasota Cay Club condominium subdivision, and/or
7  took title to what was designated as the "common elements" of the
8  Sarasota Cay Club subdivision.

9  **SUMMARY**

10  50.  The MARKETING, SALES, and PROMOTIONAL PARTIES, in
11  conjunction with, in conspiracy with and as agents for the
12  PURCHASING AND OWNER DEFENDANTS(identified at PARAGRAPH NOS. 44-63)
13  ("P&O DEFENDANTS") engaged in a fraudulent scheme in interstate
14  commerce.[1]

15  51.  Plaintiffs allege a RICO Enterprise.

16  52.  The P&O DEFENDANTS  are the nucleus of the RICO
17  Enterprise.  The MS&P DEFENDANTS conspired with others and assisted
18  in the RICO Enterprise not only with regard to the SARASOTA
19  DEVELOPMENT, but with regard to other developments as well.

20  53.  Plaintiffs assert an Enterprise in that the P&O
21  DEFENDANTS, the APPRAISER PARTICIPANTS, and the LAWYER PARTICIPANTS
22  worked together to commit the same fraudulent acts in interstate
23  commerce in developments other than SARASOTA.  Attached as Exhibit

24  --------------------------------------------

25  [1] The Court has directed that the plaintiffs file an amended
    complaint and six (6) separate complaints as to each group of
26  defendants.  Plaintiffs have done so. In this Amended Complaint,
    plaintiffs identify the "PURCHASING and OWNER DEFENDANTS."
27  PLAINTIFFS appropriately designate the defendants applicable in
    each complaint as required by the March 30, 2011 Court Order
28  (#159). For ease of exposition, Plaintiffs include other entities
    or persons, identified as "PARTICIPANTS," to whom the particular
    defendants are related.

1  No. 1 is a 2006 brochure identifying "Memberships" and "Cay Clubs."

2  Page 2 of Ex. No 1 identifies: (1) "Clearwater Cay Club; (2) "Las

3  Vegas Cay Club;" and

4  (3) "Sarasota Cay Club."   Thereafter there were others, including

5  the Orlando Cay Club.

6       54.   The fraudulent scheme which was simple in concept,

7  and complex in execution, consisted of the following:

8            (a)   Parties would acquire existing improved property

9  (that provided living facilities), apartments, or in the case of

10 Sarasota, a Best Western motel.

11           (b)   The improvements acquired were approximately twenty

12 years of age and had experienced considerable depreciation, which

13 allowed acquisition at a relatively low cost per unit.

14           (c)   The parties would engage in a very extensive

15 promotional and marketing campaign of a "Cay Club."   The marketing

16 materials were purposely ambiguous in identifying the sale of a

17 "condominium," referring at the same time to "membership in the Cay

18 Club."

19           (d)   The marketing materials offered to sell

20 "condominiums" in the context of a Cay Club resort, implying that

21 the purchasers of a condominium would receive an undivided interest

22 in the resort, or that the purchaser would have rights or an

23 entitlement to an undivided interest in the Resort as a whole, be

24 it "shared facilities," or "common elements."

25           (e)   The marketing materials represented that the

26 developer was intending to greatly improve the "common" grounds (in

27 Sarasota), and that there was soon to be constructed a "Phase II,"

28 condominiums to be sold at price much higher then the those

1  available for sale in 2006 and 2007 (phase I, purchased by the

2  plaintiffs).

3      (f)   The marketing materials represented, that after

4  purchase, the developers would greatly upgrade each of the

5  "condominiums" (20 year old motel rooms in Sarasota, 15 year old

6  apartments in Las Vegas), would totally refurbish and improve the

7  unit, and would  furnish the unit with plasma televisions and high

8  quality furniture and fixtures.

9      (g)   The marketing materials, sales documents,

10  reservation, purchase and sale agreement, and the deed, all

11  indicated that the purchaser (the plaintiffs) were purchasing a

12  condominium as identified under Florida Statute 718.

13      (h)   Though the advertisements and promotional materials

14  indicated that there was an "option leaseback," in fact the

15  SARASOTA Development (also Clearwater, Las Vegas, Orlando and

16  others) absolutely required that each purchaser lease back whatever

17  they purchased.

18      55.   It was through the representations identified above

19  made in 2005, 2006 and 2007 by the P&O DEFENDANTS, that induced the

20  forty two (42) plaintiffs purchasers to enter into twenty seven

21  (27) purchase and sale agreements, where the purchasers each paid

22  $300,000.00 to $400,000.00 for something.

23      56.   There was fraud in making representation of fact

24  that were not true, there was fraud in concealment, there was

25  negligent misrepresentation, in making representations, in which

26  there was no reasonable ground for such representations.

27      57.   **In fact there was no grant of a** condominium to any

28  of the plaintiffs and **the SARASOTA CAY CLUB had no condominiums to**

1  sell, and there was no intention to in fact sell a condominium at

2  any time.   In fact no purchaser was provided any right or interest

3  or entitlement to the very extensive (and to be developed)

4  "common," or "shared" facilities which would result in a resort

5  community, and there was no intention to create any resort or

6  provide any interest or entitlement or rights to use at any time.

7  In fact there was no intent to refurbish and upgrade the unit

8  purchased, and there was no intent to install high quality

9  furnishings.

10         58.   Plaintiffs are mindful of the Court's March 30, 2011

11  Order (#159) which holds that Under Fed. R. Civ. P. 9 ) b), a claim

12  sounding in fraud:

13              "[M]ust state with particularity the
               circumstances constituting the fraud. The Rule
14              covers all types of fraud claims, including the
               claims of securities fraud, violation of the
15              Interstate Land Sales Act, Rico, Intentional
               misrepresentation, fraudulent concealment
16              conspiracy to commit fraud and negligent
               misrepresentation." (Court Order #159 at 5).

17
               "Plaintiffs are required to identify:
18             (1) Precisely what statements were made in what
               documents or oral representations in or what
19             omissions were made, and (2) the time and place
               of each such statement and the person
20             responsible for making (or in the case of
               omissions, not making) same and (3 the content
21             of such statements and the manner in which they
               misled the plaintiff, and (4) what the
22             defendants obtained as a consequence of the
               fraud." (Order #159 at 5-6).

23

24         **STATEMENTS THAT WERE MADE THAT WERE FALSE AND FRAUDULENT**

25                              **ADVERTISING**

26         59.   The **P&O DEFENDANTS**, during 2005, 2006 and 2007,

27  provided advertising and promotional materials to the plaintiffs,

28  which advertising and promotional material made false and

1  fraudulent representations to induce the plaintiffs to enter into
2  purchase and sale agreements with regard to the Sarasota
3  development.

4          60.   Exhibit No. 23, entitled "Cay Clubs Resorts and
5  Marinas" brochure, states (Ex. 2, p. 2): ( 1)"Built In Equity,"
6  (2) "Immediate Income," (3) Hedged From Bubble," (4) "Exit
7  Strategy," (5) (Ex. 2, p. 3) provides a copy of an "**Individual**
8  **Condominium** Unit Appraisal Report; (6) states "Appraised Value =
9  $275,000;" (7) "16.18% Instant Equity At Close Of Escrow;" (8) (Ex.
10 2, p. 4) "Apartment To Condo," "Increase In Value," (9) "This is a
11 fee simple ownership, just as if you **purchased a condominium** right
12 in your own neighborhood." [Emphasis added.]

13         61.   The statements in Exhibit No. 2 distributed to the
14 plaintiffs by the P&O DEFENDANTS during 2005, 2006 and 2007 in
15 conjunction with, in conspiracy with and as agents for the P&O
16 DEFENDANTS    were false and fraudulent:

17         (1)   **There was no:** "Built In Equity;" (2) **There was no:**
18 "Immediate Income;" (3) **There was no:** "Hedged From Bubble,"
19 (4) There was no: "Exit Strategy," (5) The "purported" Condominium
20 Appraisal Report was false ("Appraised Value = $275,000"). **The**
21 **real appraised value was very much lower than stated.** (6) **There was**
22 **no:** "16.18% Instant Equity At Close Of Escrow;" (7) **There was no**
23 **conversion of an:** "Apartment To Condo," (8) **There was no:** "Increase
24 In Value," (9) **There was no:** " fee simple ownership (granted to
25 anyone) just as if **you purchased a condominium** right in your own
26 neighborhood." **The plaintiff purchasers did not purchase or**
27 **receive a condominium, and/or what they received if anything**
28 **remains in great doubt.**

---

1       62.   Exhibit No. 3 is a further advertisement provided

2   during 2005, 2006 and 2007 to the plaintiff purchasers by the P&O

3   DEFENDANTS.   Exhibit No. 3 states: ( 1) "Luxury Mixed-Use

4   Waterfront Resort," (2) "Optional 2 year lease back program equal

5   to 15% of purchase price offers Guaranteed income," (3) Up to 140

6   Conversion Units will be offered during the initial phase with

7   potential of up to another 2000 new construction units in

8   Phase II," (4) "complete furniture package with Plasma TV's

9   included (avg. $25,000 value);" (5) $5,000 refundable reservation

10  fee to reserve an opportunity to participate, $10,000 additional

11  reservation fee at unit selection, <u>"Total of $15,000 then becomes</u>

12  <u>nonrefundable</u>," (Ex. No 3)

13      63.   The statements and representations in Exhibit No. 3

14  were false and fraudulent: ( 1) **The purchasers of the Sarasota Cay**

15  **Club would not have any access rights or entitlement to a** "Luxury

16  Mixed-Use Waterfront Resort," (2) **The purchasers did not have an**

17  **"Option" for a two year leaseback, the two year lease back was**

18  **mandatory as a condition of the purchase. (3) The mandatory** "... 2

19  year lease back program..." purported to provide rent for the

20  mandatory lease back. (4) **There were no 140 Conversion units from a**

21  **motel to a condominium, no units were in fact converted from a**

22  **motel to a condominium. (5) There were no plans to create 200**

23  **additional units in a Phase II. (6)** There was no intent at the time

24  **of the sale to the plaintiffs to provide any complete furniture**

25  **package" of any nature** (avg. $25,000 value) (Ex. No 3).

26      64.   Exhibit No. 4 consisted of five (5) photograph

27  renderings distributed in 2005, 2006 and 2007 by the P&O DEFENDANTS

28  to the plaintiffs, purporting to demonstrate the upgrades to be

1   made to "purported" units plaintiffs purchased.  The advertising
2   and photographs were misleading, false and fraudulent.  **There was**
3   **no intent at the time of the circulation of the five (5) photograph**
4   **renderings (Ex. No 4) to provide any of the upgrades identified and**
5   **none were provided.**

6         65.  Attached as Exhibit No. 5, is part of a 2006
7   "purported appraisal" for one of the plaintiffs' purchases.  The
8   appraisal identifies (Ex. No 5 at 2) "INDIVIDUAL CONDOMINIUM UNIT
9   APPRAISAL REPORT."  **There was no appraisal of a condominium, in**
10  **that no condominiums were offered for sale at the SARASOTA**
11  **development.**

12        66.  In 2005, 2006 and 2007 the P&O DEFENDANTS presented
13  false appraisal reports to the plaintiffs to induce them to enter
14  into twenty seven (27) purchase and sale agreements.  The
15  appraisers, at a minium, engaged in negligent misrepresentation in
16  creating the 2005, 2006 and 2007 appraisals.

17        67.  The appraisal (Ex. No. 5) includes photographs of
18  the exterior of the existing improvements to two-story buildings
19  (Ex. No. 5, at 2 and 3) ("subject front," "subject rear"), which
20  depict the existing two story buildings of the Sarasota Development
21  in 2005, 2006 and 2007, at the time plaintiffs entered into their
22  twenty seven (27) purchase and sale agreements.

23        68.  Attached as Exhibit No. 6 are elements of a 2006
24  Sarasota Cay Club marketing brochure, which in 2006 and 2007 the
25  P&O DEFENDANTS distributed and presented to the plaintiffs to
26  induce them to enter into the twenty seven purchase and sale
27  agreements.  Ex. No. 6 (at 2, 3 and 4) purports to depict the
28  upgraded exterior of the two-story buildings.  **The Exhibit No. 6**

---

**COMPLAINT NO. 3**

1 | renderings were false and fraudulent in that there was no intent to

2 | undertake any of the refurbishment and upgrades as identified in

3 | Ex. No 6, and the MS&P DEFENDANTS knew there was no intent to sell

4 | condominiums, upgrade individual units, or upgrade the improvements

5 | (two-story buildings).

6 | **THE SARASOTA CAY CLUBS DID NOT CREATE CONDOMINIUMS, DID NOT HAVE**

7 | **CONDOMINIUMS TO SELL, NEVER HAD A CONDOMINIUM TO SELL, AND THE**

8 | **ENTIRETY OF THE DOCUMENTATION RELATING TO THE SARASOTA CAY CLUBS**

9 | **AND THE PLAINTIFFS WAS FALSE AND FRAUDULENT.**

10 | 69.  Exhibit No. 7 is a "Special Warranty Deed," provided

11 | to the plaintiffs upon purchase. Exhibit No. 7 was typical of the

12 | deeds provided in each of the twenty seven (27) purchases. The

13 | "Special Warranty Deed," states:

14 | "Unit C203, SARASOTA CAY CLUB CONDOMINIUM, **a**

15 | **Condominium** according to the Declaration of condominium as recorded in Official Records book 2078, pages 2292 through 2404, together

16 | with all appurtenances, thereto, included an undivided interest in the common elements of

17 | said Condominium as set forth in the Declaration of Public Records of Manatee

18 | county, Florida." (Ex. No. 7) (Emphasis added.)

19 | 70.  The deed issued to each of the plaintiffs (Ex.

20 | NO. 7) was false and fraudulent and the MS&P DEFENDANTS knew the

21 | deed was false and fraudulent. **SARASOTA CAY CLUB was not, and never**

22 | **was, a condominium development, nor a condominium conversion, and**

23 | **the SARASOTA CAY CLUB never had any condominium to transfer.   The**

24 | **deed which identifies:** "Unit C203, SARASOTA CAY CLUB CONDOMINIUM, a

25 | Condominium," **was not, under as a matter of fact and law, a**

26 | **condominium, and no condominium was ever conveyed.**

27 | ///

28 | ///

1  **THE BASIS OF ALLEGING THAT THERE WAS NO CONDOMINIUM CREATED AND**

2  **THEREFORE OFFERED BY THE SARASOTA DEVELOPMENT**

3      71.  Plaintiffs assert that there are two (2) bases for

4  alleging that the entirety of the SARASOTA CAY CLUB representation

5  as a condominium development was false and fraudulent.

6      72.  The first basis is that the 2005 "DEVELOPER"

7  DC705JV, LLC, a Florida limited liability company "DECLARATION OF

8  SARASOTA CAY CLUB CONDOMINIUM" ("DEC-CONDOMINIUM") did not create

9  any condominium, in that, firstly, the declarant "DEVELOPER" **DC705**

10  **JV did not have ownership of sufficient property rights** (Florida

11  718.104) to create a condominium and, secondly, that the DEC-

12  CONDOMINIUM did not comply with Florida 718.104 (4)(f"):

13        "...[M]ust contain or provide for ... the
   undivided share of ownership of the common

14        elements and common surplus... ."

15      73.  The plaintiffs' second basis is found in the conduct

16  of the P&O DEFENDANTS in their total failure during 2005, 2006 and

17  2007 to comply with any of the numerous filing and approval

18  requirements of Florida Statute Chapter 718 (CONDOMINIUMS) (2004)

19  as implemented by the Florida Administrative Code, Department of

20  Business and Professional Regulation ("DIV B&PR"), Division of

21  Condominiums Timeshares and Mobile Homes ("DIV CONDOMINIUM").

22      (a)  Pursuant to Florida Statute 718 as implemented by

23  the FAC, creating a condominium, particularly by conversion,

24  imposes numerous obligations, filing and approval requirements by

25  the DIV CONDOMINIUM.

26      (b)  Every Sarasota purchase and sale reservation

27  agreement, lease, and the DEC CONDOMINIUM, must be approved by the

28

1 | DIV CONDOMINIUM, under the DIV B&PR, under the Florida

2 | Administrative Code ("FA-CODE").

3 |   (c)  Under the FA-CODE, the P&O DEFENDANTS are deemed to

4 | be "con-current developers" (FA-CODE 61b-15.007(c)).

5 |   (d)  With a conversion, the Florida Statute and the FA-

6 | CODE imposes upon the developers to provide disclosures as to age,

7 | depreciation, costs of repair, and imposes obligations on the

8 | developer and the the MS&P DEFENDANTS to disclose to the plaintiffs

9 | age and cost of repair, which the MS&P DEFENDANTS never provided.

10 |   74.  In 2005, 2006 and 2007 the P&O DEFENDANTS were

11 | required to provide upwards of twenty (20) filings with the D of

12 | BP&R, and receive upwards of twenty (20) approvals.  Neither the

13 | MS&P DEFENDANTS nor the P&O DEFENDANTS  provided one filing, not

14 | one approval was granted, and none of the documentation of the

15 | SARASOTA CAY CLUBS (including the DECLARATION) was ever approved by

16 | the Department of Business and Professional Regulation.

17 | **THE CONDOMINIUM DECLARATION WAS A NULLITY IN THAT THE PARTY**

18 | **FILING THE CONDOMINIUM DECLARATION, "DC705JV," WAS NOT VESTED WITH**

19 | **THE SUBJECT PROPERTY THAT WAS TO BECOME THE CONDOMINIUM.**

20 |   75.  Florida Statute 718 (2004) "CONDOMINIUMS," 718.104

21 | "Creation of condominiums; contents of declaration.-(provides) (Ex.

22 | No. 8:

23 |   "Every condominium created in this state shall
     be subject to this chapter."

24 |

25 |   76.  Florida Statute 718 (2004) 718.104 (1) (Ex. No. 8)

26 | provides:

27 |   (1) "A condominium may be created <u>on land owned
     in fee simple or held under a lease complying</u>

28 |   with the provisions of s. 718.401." [Emphasis
     added.]

77.   As of the August 26, 2005, Filing of the DEC-CONDOMINIUM" (Ex. No. 9 face page and signature page of DC 705JV LLC "DEVELOPER"), DC705JV LLC was not the "owner in fee simple..." of the property which was the subject of the purported condominium.

78.   As of 2005, "DEVELOPER," DC705 JV LLC, therefore could only create a condominium (Florida Statute 718.104 (1), if "held under a lease" if DC705JV LLC could comply with Section 718.401".

79.   Florida Statute (2004) 718.401(1), "Leaseholds" (Ex. No 10), provides:

> "A condominium may be created on lands held under lease or may include recreational facilities or other common elements or commonly used facilities on a leasehold, if, on the date the first unit is conveyed by the developer to a bona fide purchaser, the lease has an **unexpired term of at least 50 years.**"
> (Emphasis added.)

(2)   Florida Statute (2004 718.401 (1)(a) (Exhibit No 10) provides:

> "The lease land must be identified by a description that is sufficient to pass title, and the **leased personal property must be identified by a general description of the item of person property and the approximate number of each item of personal property that the developer is committing to furnish for each room or other facility.**" [Emphasis added.]

80.   The July 26, 2005 "DEVELOPER" DC705JV,LLC DEC-CONDOMINIUM (Ex. No. 9) could not have complied with 718.401(1) in that:

(a)   As of April 26,2005, DC705 JV, LLC, a Florida limited liability company ("THE DEVELOPER," THE CONDOMINIUM DECLARANT), was a lessee of the property.  The Lease (Ex. No 11)

1  from lessor, S Bay Development, to DC705JV, LLC, at paragraph one

2  (1) provides:

3          "<u>Lease and Option Term.</u>   The term of the Lease
            and Option Agreement is <u>twenty-four (24) months</u>
4          beginning April 26, 2005 and ending April 26,
            2007." (Ex. No. 10)

5

6          (b)   The first bona fide sale of the Sarasota Cay Club

7  occurred in early 2006. As of that time, DEC-CONDOMINIUM (Ex.

8  No. 9), the Developer declarant, DC705JV LLC, did not <u>have fifty</u>

9  <u>(50) year</u> "Leaseholds" (Ex. Nos. 10 and 11).

10         (c)   The leasehold (Ex. No. 11) not only is not 50 years

11  (only 2) but does not in any manner describe "... the leased

12  personal property."

13         81.   The 2005 DECLARATION OF CONDOMINIUM by DC705JV, LLC

14  (Ex. No. 9) was a nullity and a fraud in that DC 705 JV, LLC (The

15  "DEVELOPER") was a lessee (Ex. No. 11), which lease as of the date

16  of the filing of the "DECLARATION OF CONDOMINIUM,"<u> had less than</u>

17  <u>two years to run</u>.   DC705JV, LLC could not have created a

18  condominium as a matter of fact and law.   The declarant, the

19  developer, did not have sufficient title to create a condominium.

20         **<u>THE SARASOTA CONDOMINIUM DECLARATION WAS DEFECTIVE</u>**

21         82.   Florida (2004) 718.104 (4) (Ex. No. 13) states the

22  "Declaration Must Contain Or Provide For The Following Matters,"

23  and thereafter lists sub-paragraphs (a) through (o).   Florida

24  (2004) 718.108 (Ex. No. 12) is entitled "Common Elements," and

25  states "Common Elements" includes within its meaning the

26  following:" (listing (1) (a)-(d)).

27         83.   Florida (2004) 718.104 (4)(f) (Ex. No. 12) requires

28  that the "Declaration Must Contain Or Provide for":

---

**COMPLAINT NO. 3**
- 23 -

1        "The undivided share of ownership of the common
elements and common surplus of the condominium
2        that is appurtenant to each unit stated as a
percentage or a fraction of the whole."

3

4        84.  **The Declaration of the Sarasota Cay Club**

5 **Condominium, does comply with 718.104 (4)(f), and does not "contain**

6 **or provide" or state:**

7        **"The undivided share of ownership of the
common elements and common surplus of the**
8        **condominium that is appurtenant to each unit
stated as a percentage or a fraction of the**
9        **whole... ." (Ex. No. 12 at 4]**

10        85.   The Declaration (2078 PG 2293-2294 (2 of 113) (Para

11 2.13) (Ex. No. 13) provides:

12        "Common Elements," means and include:

13        "(A) The portions of the Condominium Property
which are not included within the Units.
14        "(b) An easement of support in every portion of
a Unit which contributes to the support of the
15        Building.

16        "(c) Any other parts of the Condominium
Property designated as Common elements in this
17        Declaration.

18        "The Condominium has been established in such a
manner to minimize the Common elements. Most
19        components which are typical "common elements"
of a condominium have instead been designated
20        herein as part of the Shared Components of the
commercial units.  No portion of the Shared
21        Facilities shall be deemed Common Elements
hereunder."

22

23        86.   Nowhere in the SARASOTA CONDOMINIUM DECLARATION

24 does it provide or state as required to be included in the

25 Declaration (Florida (2004) 718.104 (4) (f)):

26        "The undivided share of ownership of the common
elements and common surplus of the condominium
27        that is appurtenant to each unit stated as a
percentage or a fraction of the whole."

28

1        87.   The DECLARATION of Condominium, in two places,

2   identifies "common elements", that "being the land 59' below

3   elevation of the condominium property."

4            (a)  Para. 3.4 of the DECLARATION (PG 2300), "Boundaries

5   of Commercial Units" states:

6            "<u>Boundaries of Commercial Units</u> ... shall
             consist of all of the Condominium Property,

7            including, without limitation, any and all
             improvements now or hereafter constructed

8            thereon, less and except only the following:

9            "(I) The Residential Units;

10           "(ii)     The Common Elements;

11           "(iii) The portion of the Condominium Property
             below elevation minus fifty feet (-50.0')

12           N.G.V.D. (surface). Said portion of the
             Condominium Property lying below elevation

13           <u>minus fifty feet (-50.0') N.G.V.D. shall be
             deemed Common elements hereunder</u>." [Emphasis

14           added.]

15       88.   The DEC-CONDOMINIUM MAP at 2357 (66 of 113) (Ex. No. 15

16   with a enlarged paragraph) states:

17           "THE COMMON ELEMENTS (AS DEFINED IN THE
             DECLARATION OF CONDOMINIUM) AND THE PORTION OF

18           THE COMMERCIAL PROPERTY BELOW ELEVATION MINUS
             FIFTY FEET (050') H.G.V.D.   SAID PORTION OF THE

19           CONDOMINIUM PROPERTY LYING BELOW ELEVATION
             MINUS FIFTY FEET (-50) N.G.V.D. SHALL BE DEEMED

20           COMMON ELEMENTS HEREUNDER."

21           The only COMMON ELEMENT identified IS "SAID PORTION OF

22   THE CONDOMINIUM ...BELOW ELEVATION MINUS FIFTY FEET.."

23       89.   Para. 3.4 of the Declaration (Ex. No. 16)

24   identifies "Unit Boundaries," and includes "Boundaries of

25   Residential Units."  The Boundaries of the residential units are:

26           "(I) Upper Boundaries. The horizontal plane of
             the unfinished lower surface of the ceiling.

27

28           "(ii) Lower Boundaries. The horizontal plane of
             the unfinished upper surface of the floor of
             the Residential Unit.

"(iii) Perimetrical Boundaries, are ... the vertical planes of the unfinished interior surfaces of the walls."

90.    Para. 2.34 (2297) of the DECLARATION identifies as Shared Components," (not Common Elements):

(c) [A]ll utility, mechanical, electrical , telephonic telecommunications, plumbing and other systems including, without limitation, all wires, conduits, pipes, ducts, transformers, cables and other apparatus used in the delivery of the utility, mechanical, telephonic telecommunications, electrical, plumbing and/or other services."

91.    Statute 718.108 (1)(d) by Florida Statute (2004) provides that Common Elements by law (Ex. No. 12 at 7) include:

"(d) The property and installations required for the furnishing of utilities and other services to more than one unit or to the common elements."

92.    The DECLARATION excludes from Common Elements, a very element required by law (718.198 (1)(d)) to be included in the "common elements."

93.    The only Common Elements (shared by all purported condominium owners) found in the Declaration, is:

"Said portion of the Condominium Property lying below elevation minus fifty feet (-50.0') N.G.V.D. shall be deemed Common elements hereunder." (DECLARATION 3.4 (b) (iii). (Ex. No.15)

94.    The land -50' under the surface is not appurtenant to any owner's unit, and therefore does not qualify as a common element for purposes of a condominium.  The declaration **is defective as a matter of law, in that it provides no "common element" shared by all appurtenant to the condominium.  The declaration is defective as a matter of law in that it does not identify:**

1    "The undivided share of ownership of the common
     elements and common surplus of the condominium
2    that is appurtenant to each unit stated as a
     percentage or a fraction of the whole."
3    (718.104(4)f.)

4        95.   PG 2403 (112 of 113) of the Declaration (Ex. No 17)

5    states:

6        "PERCENTAGE SHARE OF ALLOCATION OF SHARED
         COMPONENTS" "Each unit in the Sarasota Cay Club
7        Condominium has the following percentage of
         share of allocation of Shared Components and
8        all other allocations: 0.00559%."

9        96.   PG 2403 (112 of 113) does not identify "the

10   undivided share of ownership of the common elements and common

11   surplus."   It purports to identify "Percentage Allocation of the

12   Shared Components," which the Declaration states are not included

13   in the Common Elements.

14       97.   Para 2.15 "Common Surplus," means the excess of all

15   receipts of the Condominium Association collected on behalf of the

16   Condominium Association, including, but not limited to Assessments,

17   rents, profits and revenues on account of the Common Elements, over

18   the amount of Common Expenses."

19       98.   The DECLARATION does not indicate as required the

20   "undivided share of ownership of the "...common surplus that is

21   appurtenant to each unit, stated as a percentage or a fraction of

22   the whole."

23       99.   Given that a material and substantive element of

24   the DECLARATION is omitted, the Declaration is not sufficient to

25   create condominiums.

26       100.   No condominiums were created by the false defective

27   and fraudulent August 26, 2005 DC 705 JV, LLC DECLARATION.

28   ///

1  **FAILURE TO COMPLY WITH FLORIDA LAW**

2  101. The P&O DEFENDANTS did not in any manner act

3  consistent with Florida Law 718 and the FA-CODE to Create

4  Condominiums.

5  102. Florida Administrative Code ("FAC") (Department of

6  Business and Professional Regulation ("DEPT B&PR") Division of

7  Florida Condominiums ("DIV FL CONDO") (Ex. 18, face page and cover

8  page) provides:

9         "Chapter 718 of the Florida Statutes, also
          known as the Condominium Act, is a chapter of
10        law that governs condominiums in the State of
          Florida. The Condominium Act should be read in
11        conjunction with Chapters 61B-15 through 25, 45
          and 50, Florida Administrative Code. These
12        administrative rules are promulgated by the
          Division of Florida Condominiums, Timeshares,
13        and Mobile Homes to interpret, enforce, and
          implement Chapter 718, Florida Statutes. Due to
14        the numerous changes to the administrative
          rules, readers should inquire periodically to
15        ensure that they are referring to the most
          recently revised copy."

16

17  **REGULATIONS AS TO CONVERSIONS TO CONDOMINIUMS**

18  103. Florida Statutes (2004) 718.616-718.622 (Ex. No. 9)

19  provides with regard to conversion of existing occupied

20  improvements (Condominium Conversion) requires:

21        "718.616 **Disclosure of condition of building
          and estimated replacement costs and
22        notification of municipalities.**"

23        "(1) Each developer of a residential
          condominium created by converting existing,
24        previously occupied improvements to such form
          of ownership shall disclose the condition of
25        the improvements and the condition of certain
          components and their current estimated
26        replacement costs." (Ex. No 9).

27  104. The disclosure statement requires disclosure of

28  "date and type of construction," "prior use," "termite damage"

---

**COMPLAINT NO. 3**

investigation, "roof," "structure," "fireproofing and fire protection systems," "elevators," and "heating and cooling systems."

> Disclosure requires:
> "(2) The estimated remaining use life of the component.
>
> "(3) The estimated current replacement cost of the component expressed:
>
> (a) As a total amount; and
>
> (b) As a per-unit amount, based upon each unit's proportional share of the common expenses." (Ex. No 19)

105. **Though such disclosure was required by Florida Statute 718.616** (2004 Ex. No. 9), there was absolutely no disclosure by the **Marketing Realtor and Sales Promotion Defendants,** of any of the disclosures required by statute (718.616) for a condominium conversion.

106. Florida Statute 718.618 (2004) (Ex. No 19) provides:

> "When existing improvements are converted to ownership as a residential condominium, the developer shall establish reserve accounts for capital expenditures and deferred maintenance, or give warranties as provided by subsection (6) or post a surety bond as provided by subsection (7)."

107. No reserve account was established **nor identified,** by any of the Marketing Realtor and Sales Promotion Defendants.

108. Florida Administrative Code Division of Florida Condominiums "61B-24.004 Disclosure of Building Condition," (Pursuant to 61B-24 CREATION OF CONDOMINIUMS BY CONVERSION) (Ex. No. 20) at "61B-24.004 Disclosure of Building Condition," provides in a "conversion:"

> "(1)(a) Disclosure of building condition is required in order that the prospective

purchasers be informed as to the scope and
magnitude of the financial responsibility that
condominium ownership entails.  Section 718.616
Florida Statutes (Supp.1980) sets forth the
information that shall be disclose disclosed
and components for which disclosure is made."
(Ex. No. 10)

"(b) Disclosure of condition is required for
all condominium property, in particular
condominium property intended for use in
connection with the condominium." (Ex. No. 10)

109. Disclosure was required as to informing the

purchaser of the age and condition of the converted property.

110. Though these disclosures were required by law

imposed by statute and regulation, no such disclosures were made by

the P&O DEFENDANTS. The failure to disclose while purported to sell

a condominium converted from existing property was a fraud by

failure to disclose imposed by statute.

111. Florida Statute as of 2004, 718.622 imposed filing

requirements by the developer with the Florida Division of Florida

Condominiums.  No filing was provided by the Sarasota Cay Club.

**THE DEFINITION OF DEVELOPER**

**THE OBLIGATIONS OF THE DEVELOPER TO THE DEPT. OF BUSINESS AND**

**PROFESSIONAL REGULATION (DIV. OF CONDO)**

112. Exhibit No. 20 is FA-CODE61B-15.0011, "DEFINITIONS."

"(3) 'File' means to submit required
documents to the division in the Tallahassee,
Florida office..."

"(4) 'Filing' means the documents required
to be submitted to the division pursuant to
Sections 718.502, 718.503 and 718.504 Florida
Statutes."

113. Exhibit No. 21 is FA-CODE61B015.0012, "FORMS."

///

"(1) The forms prescribed for use by the division for submission of filings and documents are the following:

"(a) Developer/Condominium Filing Statement .... effective 12-23-02."

"(b) Filing Statement for subsequent Phases ... effective 12-23-02."

"(c) Notice of Condominium Recording ... effective 8-15-05."

114. Exhibit No. 22 is FA-CODE61B-15.007 "Developer, Defined."

"(a) A creating developer, which means any persons who creates a condominium;

...

"(c) A concurrent developer, which means any person who acts concurrently with a developer in offering to sell or lease for more that five years condominium parcels in the ordinary course of business. As used in this rule, persons include natural persons, corporations, partnership, limited liability companies and any other legal entities.

"(2) The following constitutes 'offering condominium parcels in the ordinary course of business' for filing purposes as defined by subsection 61B-15.0011 (4) FAC, where that person:

"...

"(b) Participates in a common promotional plan that offers more than 7 parcels within a period of one year. A person is not, however, deemed to have participated in a plan merely by virtue of providing financial contributions or professional or brokerage services."

115. FA-CODE61 B-17.001 (1)(a) and (3), "Developer, Filings required (Ex. No. 23):

"(1)(a) Except in the case of a reservation program, a developer of a residential condominium shall file with the Division one copy of each document required by Sections

718.502(5), 718.503, and 718.504, Florida Statutes.  The filing shall occur prior to any offering of a condominium unit to the public. The developer shall submit with the filing a Developer/Condominium Filing Statement, DBPR Form CO 6000-2, referenced in Rule 61B-15.0012, F.A.C."  (FA-CODE61 B-17.001 (1)(a)) [Emphasis added.]

"...

"(3) Upon recording the declaration of condominium pursuant to Section 718.104(2), Florida Statutes, or amendments adding phases pursuant to Section 718.403, Florida Statutes, the developer shall file the recording information with the Division within 120 working days on DBPR Form CO 6000-1, NOTICE OF CONDOMINIUM RECORDING INFORMATION, as referenced in Rule 61B-15.0012, F.A.C. submitted with DBPR Form CO 6000-1, NOTICE OF CONDOMINIUM RECORDING INFORMATION, as referenced in Rule 61B-15.0012, F.A.C."

116. Florida Code Section 718.502 (1)(b) (Ex. No 23) provides as follows:

"(b) A developer may not close on any contract for sale or contract for a lease period of more than 5 years until the developer prepares and files with the division documents complying with the requirements of this chapter and the rules adopted by the division and until the division notifies the developer that the filing is proper and the developer prepares and delivers all documents required by s. 718.503(1)(b) to the prospective buyer." [Emphasis added.]

117. Section 718.502 (2)(a) (2000) provides as follows:

"(2)(a) Prior to filing as required by subsection (1), and prior to acquiring an ownership, leasehold, or contractual interest in the land upon which the condominium is to be developed, a developer shall not offer a contract for purchase of a unit or lease of a unit for mor than 5 years. However, the developer may accept deposits for reservations upon the approval of a fully executed escrow agreement and reservation agreement form properly filed with the Division of Florida Land Sales, Condominiums, and Mobile Homes. Each filing of a proposed reservation program

<u>shall be accompanied by a filing fee of $250.</u>"
[Emphasis added.]

118. The Sarasota Cay Club did not comply with: (1) 718.616-718.622 as to "conversion;" did not comply with the 718.616 as to "disclosures," did not comply with FAC 61B-24.004 as to disclosures; and did not comply with any of the regulations FAC 61-B017.001 (1) (a) ; 61B-15.0012 and Florida Code 718.502 (1) (b);and 718.502 (2) (a) as to submission and approval.

119. Pursuant to 718.502 (2)(b) (Ex. 23) all reservations must be subject to a "fully executed escrow agreement and reservation agreement form properly filed with the Division of Florida Land Sales, Condominium with a filing fee of $250." Pursuant to 718.502 ( c), "the reservation agreement form" must include the following:

> "1. A statement of the obligation of th e developer to file condominium documents with the division prior to entering into a binding purchase agreement or binding agreement for a lease of more than 5 years.

> "2. A statement of the right of the prospective purchaser to receive all condominium documents as required by this chapter.

> "3. The name and address of the escrow agent.

> "4. A statement as to whether the developer assures that the purchase price represented in or pursuant to the reservation agreement will be the price in the contract for purchase and sale or that the price represented may be exceeded within a stated amount or percentage or that no assurance is given as to the price in the contract for purchase or sale.

> "5. A statement that the deposit must be payable to the escrow agent and that the escrow agent must provide a receipt to the prospective purchaser."

120. Not one of the P&O DEFENDANTS, nor did anyone on behalf of the Sarasota Cay Club Development or any of the entities

1   involved "File" (FA-CODE, Ex. No 13) or provide a "Filing," (FA-

2   CODE61B-15.0011 (4) "documents required to be submitted to the

3   division...") **at any time prior to during or post sale of the**

4   **"purported condominiums," with the Department of Business and**

5   **Professional Regulation, Division of Florida Condominiums.**

6          121. Not one of the MR&S DEFENDANTS, nor did the P&O

7   DEFENDANTS , nor did anyone on behalf of the Sarasota Cay Club

8   Development or any of the entities involved within "120 working"

9   days **or at any time, prior to during or after sale of the**

10  **"purported condominiums," "File" "for approval" by the Florida**

11  **Department of  Business and Professional Regulation, Division of**

12  **Florida Condominiums, the Declaration of Condominium, filed with**

13  **Manatee County.**

14         122. Though Florida Statute 718,.502 (b) provides that "a

15  developer may not close on any contract ... until the division

16  notifies the development the filing is proper..." (Ex. No. 15), the

17  MR&S DEFENDANTS (Paragraphs Nos. 30-43) in conjunction with the P&O

18  DEFENDANTS   (Paragraphs Nos. 44-63), **during 2006 and 2007, entered**

19  **into purchase and sale agreements, which purported to sell to the**

20  **plaintiffs and others upwards of 140 "purported" Condominiums at**

21  **the Sarasota Cay Club.**

22         123. The intent of the parties can be found in Ex. No 28,

23  an Email of November 9, 2004 from Harvey Birdman to Dave Clark , cc

24  Harris Friedman, Louis Birdman, Herb Hirsh, and the Stump Story law

25  firm.  Paragraph 2 (at page 2) states (though referring to Law

26  Vegas Cay Club):

27                   "If you can stomach these changes, I will make
                     ya'll between $25,000,000 and $30,000,000 in
28                   the next six months without any more effort and

---

**COMPLAINT NO. 3**

1            you can find me the next deal out there to feed
           my machine." (Ex. No 28).

2

3            Mr.Birdman's E-mail of November 9, 2004 refers to Jeff

Ader President of JDI:

4

5            "Part of the reason I'm asking for these
           concessions is because I'm given away 20% of
           the profits to Jeff Aeder (president of JDI)

6            for 75% of he capital (same deal I did with him
           in Clearwater to have $4,000,000 cushion at

7            startup..."

8

9            The last paragraph (at 2) states:

10            "Let me know on the above points so we can move
           this forward. Also, we should hear on Sarasota

11            today..." (Ex. No 28)

12         **NO VALID AGREEMENTS, NO VALID CLAUSES LIMITING LIABILITY**

13         In that there was no valid DEC-CONDOMINIUM, and in that

14 none of the documents submitted to the plaintiffs for the purchase

15 of their purported condominiums were ever approved by the

16 Department of Business and Professional Regulation as required,

17 none of the documentation presented to the plaintiffs in

18 furtherance of the purchase of a purported condominium was valid.

19           **FRAUD AS TO THE RESERVATION AGREEMENT**

20         124. The provisions of Florida Statute (2004) 718.502

21 (2)(b) identify the use of the "properly filed and approved

22 reservation agreement," with the five (5) required items identified

23 by 718.502 ( c). Attached as  Exhibit No. 24 is the form of the

24 "Reservation Agreement," provided by defendants to all plaintiffs,

25 who entered into contracts for purchase.

26         125. The "Reservation Agreement," (Ex. No. 24) is

27 **impliedly false and fraudulent in that it is titled** "Reservation

28 Agreement For Membership In the Sarasota Cay Club In Manatee

County, Florida."  **The reservation agreement (Ex. No. 24) was the only reservation agreement provided to each of the plaintiffs and was the reservation agreement which, during 2005 and 2006,** that the P&O DEFENDANTS represented to the plaintiffs was the reservation agreement for their purchase of the Sarasota Condominium.

126. The "Reservation Agreement" is titled for "Reservation ... for Membership in the Sarasota Cay Club." Paragraph 1 "hereby grants Purchaser a reservation to buy a Membership ("Membership") in the Sarasota Cay Club ... in consideration for the payment to the Club of the sum of Five Thousand dollars ($5,000)" (the "Refundable Reservation Deposit"). The reservation Agreement, Para. 1, is inconsistent with Ex. No. 2 which states:

> **"Starting base price could range from $199,900 to $399,900.." $5,000 refundable reservation fee to reserve an opportunity to participate, $10,000 additional reservation fee at unit selection. Total of $15,000 then becomes non-refundable. Balance of 10% deposit at contract minus $15,000.00."**

127. While the Reservation Agreement (Para. 1) references the $5,000.00 for a "...reservation for the Cay Club," Exhibit No. 2 references that the same $5,000.00 is for purposes of entering into a purchase and sale agreement.

128. The Sarasota Cay Club Reservation Agreement (Ex. 24) of nine (9) paragraphs **is deliberately misleading in referencing "membership in the Sarasota Cay Club," while also applying the $5,000.00 to the purchase price of whatever is to be purchased under the purchase and sale agreement.**

129. While Florida Statute 718.502 ( c)(1) states that the "Reservation Agreement," must include: "A statement of the

1 obligation of the developer to file condominium documents with the

2 division prior to entering into a binding purchase agreement..."

3 **(Ex. No. 24), the reservation agreement provided to each plaintiff**

4 **did not so state.   The Reservation Agreement (Ex. No 24) provides**

5 **no reference whatsoever to the obligation of the developer to file**

6 **documents, with the Florida Department of Business and Professional**

7 **Regulation.**

8       130. The Ex. No. 24 "Reservation Agreement" does state at

9 Para., 4:

10         "4. **Condominium Documents.** At the time Seller
        delivers a Contract to Purchaser, Seller will

11         also deliver copies of all condominium
        documents relating to the condominium and which

12         are required to be delivered under the laws of
        the State of Florida."

13

14       131. Paragraph 4 of the Reservation Agreement does not

15 comply with 718.502 ( c)( 1) which requires:

16         **"A statement of the right of the prospective
        purchaser to receive all condominium documents**

17         **as required by this chapter."**

18       132. **Paragraph No. 4 of the Reservation Agreement**

19 **provided by the** P&O DEFENDANTS **was false and fraudulent in that the**

20 **Ex. No 24 Reservation Agreement, was not a reservation for the**

21 **right to purchase a condominium, in that neither the** MR&S

22 DEFENDANTS, nor did anyone **ever comply with any of the Florida**

23 **(2004) 718.502 Regulations, nor**  FA-CODE61B-15.0011 (4) "documents

24 required to be submitted to the division..." **at any time.   The**

25 **Reservation Agreement whatever it was for, was not for the purchase**

26 **of a condominium.**

27       133. Florida (2004) 718 502 ( c)(3) (Ex. No. 15) requires

28 that the Reservation Agreement "shall include" "[t]he name and

1    address of the escrow agent." **The reservation agreement (Ex.**

2    **No. 24)** does not include the name and address of any Escrow Agent.

3            134. Florida (2004) 718.502 ( c)(3) (Ex. No. 15),

4    provides the reservation agreement "shall include,"

5            "4. A statement as to whether the developer
          assures that the purchase price represented in
6            or pursuant to the reservation agreement will
          be the price in the contact for purchase and
7            sale or that the price represented may be
          exceeded... ."

8

9            135. The Reservation Agreement (Ex. No. 24), does not **in**

10   **any manner refer to a reservation price, as required by (2004)**

11   **718.502 ( c)(3).**

12           136. Florida (2004) 718 ( c)(4) provides that the

13   Reservation Agreement "shall include" "[a] statement that the

14   deposit must be payable to the escrow agent and that the escrow

15   agent must provide a receipt to the prospective purchaser." **Ex.**

16   **No. 24, the Reservation Agreement, provides no statement the**

17   **deposit must be payable to the escrow agent, and the additional**

18   **$10,000.00 deposit is also not made to an escrow agent.**

19           137.  The Reservation Agreement demonstrates the

20   fraudulent and misleading nature of the documents presented by the

21   P&O DEFENDANTS, which at Para. 2 ("Priority") states:

22           "Seller is entering into other Reservation
          Agreements with other purchasers.  Seller will
23           keep track of the order it receives Reservation
          Agreement and will give Purchaser an
24           opportunity to select dwelling units ('Dwelling
          Units') at the condominium project that will
25           contain the amenities offered by the Club and
          will enter into Purchase contracts... ."

26

27           138. Paragraph No.2 of the Reservation Agreement was

28   **false and fraudulent, in that there was no "condominium project,"**

1  **in that there had been no filings as required, nor approval as**
2  **required by Florida Statute 718, nor compliance with the FA-CODE,**
3  **nor a valid DEC-CONDOMINIUM.   Exhibit No. 24 is particularly**
4  **ambiguously misleading in that it refers to "an opportunity to**
5  **select dwelling units at the condominium project... ."**  One cannot
6  tell if according to the reservation agreement, the "condominium"
7  is the dwelling unit, or some other form of ownership.

8           139. Attached as Exhibit No. 25 is the standard purchase
9  and sale agreement (omitting the social security number of the
10 purchaser), one of the plaintiffs.   The title of Exhibit No 25 is
11 "SARASOTA CAY CLUB CONDOMINIUM , A CONDOMINIUM PURCHASE CONTRACT."
12 **The title is false and fraudulent in that there is no Sarasota Cay**
13 **Club condominium and there was no sale of a condominium, and the**
14 **document was not a "condominium purchase contract."**

15           140. Page 1 of Exhibit No. 25 states in part:
16               "Seller agrees to sell and Purchaser agrees to
                 purchase ... Unit #N310 (the 'Unit') in
17               Sarasota Cay Club Condominium, a Condominium
                 (the 'Condominium') pursuant to the Declaration
18               of Condominium for Sarasota Cay Club
                 Condominium, a Condominium... ."
19

20           141. The language of Exhibit 25 (page one) is false and
21 fraudulent.   The Seller did not agree to sell a "condominium."   The
22 Sarasota Cay Club had no condominiums.

23           142. Attached to this FA-CODE as Exhibit No. 26 is the
24 face page of the "Sarasota Cay Club Condominium" "Prospectus."   The
25 "Prospectus" is identified in Exhibit No. 25, the purported
26 "Sarasota Condominium Purchase and sale Agreement."   Exhibit No. 26
27 purportedly provided to each of the plaintiff purchasers contained
28 false and fraudulent statements.

143. The "Prospectus" refers to: (1) "the <u>Declaration of Condominium,</u>" (2) "Declaration - By Laws of Condominium Association;" (3) "Articles of Incorporation of Condominium Association;" (4) "Estimated Operating Budget-Condominium; (5) Declaration of Covenants, Restrictions And Easements to Sarasota Cay Club Condominium."

Page 2 of the Prospectus states:

"THIS PROSPECTUS CONTAINS IMPORTANT MATTERS TO BE CONSIDERED IN ACQUIRING A CONDOMINIUM UNIT."

The Prospectus was fraudulent in that no condominium was being offered.

144. **There was no valid**: (1) "<u>Declaration of Condominium,</u>" (2) **there was no**: "Declaration -By Laws of **any valid** Condominium Association;" (3) **There was no** "Articles of Incorporation of **any valid** Condominium Association;" (4) **there was no valid** "Estimated Operating Budget-Condominium **in that there were no condominiums and no valid condominium association**; (5) **and there was no document <u>even titled</u>**: "Declaration of Covenants, Restrictions And Easements to Sarasota Cay club Condominium," **in that the document recorded immediately after the false and fraudulent** "Declaration of Condominium," (face page Exhibit No. 5, recorded **BOOK 2078 PG 2292-2404 is a document entitled "DECLARATION OF COVENANTS , RESTRICTIONS AND EASEMENTS FOR SARASOTA <u>CAY CLUB RESORT</u>,"** (BK 2078 PG 2405-2492) (Face Page, Ex. No 27).

145. There is no "DECLARATION OF COVENANTS, RESTRICTIONS AND EASEMENTS RECORDED FOR THE SARASOTA CAY CLUB CONDOMINIUMS, **in that were no and are no and never were any Sarasota Cay Club Condominiums.**

146.  The purchase and sale Agreement ("P&S AG") (Ex. No. 25) is pervasive with fraud and misrepresentation.

(a)  Page 4(Para. 5) states in part:

**Any and all amounts listed in the condominium documents that you will pay to the Condominium Association, Commercial Lot Owner (as defined in the Condominium Declaration)...are subject to change in the future."** [Emphasis in the Original].

(b)  Contrary to the P&S Agreement (Para. 25), **there are no valid "condominium documents," and there is no valid existing "condominium association..." and there is no valid basis why a purchaser under the Sarasota P&S AG would pay any amount to any non-existent "Condominium Association," based on non-existent "condominium documents."**  There is no need for a condominium association which only task is to administer land fifty feet below the surface of the SARASOTA DEVELOPMENT.

(c)  Para. 6 (B) under "Construction," states:

"...neither Purchaser nor any agent of Purchaser shall enter the Unit or the Condominium until after Purchaser has closed the purchase of the Unit...whereupon Purchaser's rights shall be as set forth in the 'Condominium Documents'...."

(d)  **There is no "Condominium" and there are no valid "Condominium Documents."**

(e)  Para. 12 of the P&S AG (Ex. No. 25 at 7) is entitled "Condition Precedent," which states in part:

"In the event that Seller has been unable to obtain purchase contracts for eighty percent (80%) of the units in the Condominium within one hundred eighty (180) days from the date the first purchaser signs a purchase contract ...of a unit in the Condominium, Seller may unilaterally terminate this contract..."

(f)   **There is absolutely no condominium, and the Sarasota Cay Club is not a condominium and never was, and there are no "units in the condominium...".**

(g)   Para. 21 (B) of the P&S AG (Ex. No. 25 at 9):

> "Purchaser acknowledges and agrees that the
> only warranties applicable to the Condominium
> and the Unit are those that may validly be
> imposed thereon by statutory law...as set forth
> in Section 718.203, Florida Statutes..."

(h)   **Para. 21 (B) was a fraudulent representation in that seller did not have a condominium to sell, and no condominium was sold under the P&S AG.**

(I)   Para. 25, Construction Financing, provides reference to:

> "...the lien of any mortgage(s) granted by
> Seller to its lender(s) ... on the Unit or the
> Condominium shall be superior in right and
> priority to any lien of Purchaser..."

(j)   **Para. 25 is fraudulent in that it refers to the "Unit or the Condominium..." when there are no condominiums at the Sarasota Cay Club development.**

(k)   Para. 28 B (P&S AG at 12) provides in part:

> "Neither this Contract nor any notice of it
> shall be recorded in any Public Records; to do
> so is a substantive breach of this Contract.
> Execution of this Contract shall not create any
> lien or lien right in favor of Purchaser
> against the Unit or the Condominium... ."

(l)   Para 28 B (P&S AG at 12) **was and is fraudulent in that there was and is "no condominium." The language is ambiguous at best in that it refers to "...the Unit or the Condominium..." as if one were separate from the other.**

(m)   Para 29 "Non-Condominium Lot Owner," states:

---

1
2
3
4

> "By purchasing the Unit, Purchaser acknowledges
> that many, if not all of the areas outside of
> the Condominium which may normally be
> considered common elements in a traditional
> condominiums ... are instead part of the Non-
> Condominium Lot...and are 'Shared Facilities'."

5     (n)   **The statement is fraudulent in that there are no**

6  **areas outside of the condominium, in that there is no condominium.**

7  **The statement is also fraudulent in that the use of the "term"**

8  **"shared facilities," in some manner implies that the purchaser will**

9  **have a right of use of the "shared facilities," which was not**

10  **granted.**

11     (o)   Para. 35 of the P&S AG provides under where it

12  states PURCHASER's INITIALS:

13
14
15
16
17

> "Purchaser's representation and warranty above
> that it has not received or relied upon any
> other representation with respect to the Unit,
> the Condominium or Sarasota Cay Club within
> which the Condominium is located, other than
> expressly set forth above, is a material
> inducement for Seller's acceptance of
> Purchaser's offer... ."

18     (p)   **The statement presented in the P&S AG (Para. 35 at**

19  **17) is false and fraudulent in the use of the phrase "with respect**

20  **to the Unit, the Condominium..."   There was, and is, no Sarasota**

21  **Condominium.   The Sarasota Cay Club has "no condominiums" "within**

22  **which the condominium is located."**

23     (q)   P&S AG (page 31) heading states: "SARASOTA CAY CLUB

24  CONDOMINIUM, A CONDOMINIUM."   **The heading (P&S AG, page31) is false**

25  **and fraudulent in that there was not and is not a "CAY CLUB**

26  **CONDOMINIUM."**

27     ®     718.103 (12) "Condominium parcel," provides:

28  ///

1   "'Condominium Parcel' means a unit, together
    with the undivided share in the common elements
2   appurtenant to the unit."

3   (s)   718.103 (13) "Condominium property" provides:

4   "'Condominium property' means the lands,
    leaseholds, and personal property that are
5   subjected to condominium ownership, whether or
    not contiguous, and all improvements thereon
6   and all easements and rights appurtenant
    thereto intended for use in connection with the
7   condominium."

8   **THE AGREEMENT TO LEASE WAS FRAUDULENT**

9   147. Attached as Ex. No. 29 is an agreement to lease that

10  was a condition required of all plaintiffs that entered into a

11  purchase and sale agreement. The Agreement To Lease (Ex. No 29)

12  provides that the purchaser will lease back the unit for two years

13  and give up all control and supervision of the property to an

14  affiliated company CC 705 LLC (no longer in good standing).

15  148. None of the plaintiffs took possession of their

16  unit, and none have possession to the present day.

17  149. Apparently in 2009, Colonial Bank foreclosed on the

18  entirely of all property in the Sarasota Cay Club other than the

19  interior of the walls of the units (Ex. No 30) and thereafter sold

20  the entirety of the property to a third party.

21  150. The plaintiffs have as described only the interior

22  of their units (excluding the balcony and do not have access to

23  their units to the present day.

24  151. Apparently the plaintiffs units are being rented and

25  used by an unknown third party.

26  **THE APPRAISALS**

27  152. Attached as Exhibit No. 31 is a typical appraisal of

28  the SARASOTA units in which the borrower is identified as plaintiff

1  Kurt M. Zurawski ("ZURAWSKI").  All appraisals are nearly
2  identical.

3          (a)  Ex. No. 31, pg. 1 identifies defendant Benchmark
4  Appraisal Services, and identifies that the appraisal is being sent
5  to defendant "Ross Pickard (at defendant) Chase (Bank)" dated
6  "06/28/2006" for a fee of "$425.00."

7          (b)  Ex. No. 31, pg. 2, identifies the property unit as
8  "7150 N. Tamiami Trial, Unit # C203, Sarasota Florida, identifies
9  the "owner" as "defendant "S-BAY DEVELOPMENT LLC."

10         (c)  Ex. No. 31, pg. 2 states: "Project Name SARASOTA CAY
11 CLUB," states: Assessor's Parcel # "NOT YET ASSIGNED TO EACH UNIT
12 **6697100052** PROJECT."

13         (d)  Ex. No. 31, pg. 2 wrongly states "Occupant Owner."
14 The appraisal (Ex. No. 31, page 2) states:

15             "SALES OFFICE OFFERING PRICE IS 285,980 ON
               06/2006."
16

17         (e)  Ex. No. 31, pg. 2 refers to "Condominium Unit
18 Housing Trends" which the appraiser indicates are: "Stable" and "In
19 Balance" and states: "PRICES ARE STABLE AND DEMAND IS IN BALANCE.
20 ACCORDING TO THE COMMUTATIVE DATE FROM THE LOCAL BOARD OF REALTORS
21 NORMAL MARKETING TIME IS 90-180 DAYS." This representation was
22 false in that the unit being conveyed was not a condominium.

23         (f)  Ex. No. 31, pg. 2, the appraiser responds: "two
24 story," "Effective Age 20," "Total # parking 205," "Guest Parking:
25 ADEQ" The appraiser states NO to the question "Is the developer in
26 control of the Homeowners's association, and states that the
27 project was a conversion to a condominium, and "June 2006, 2005 THE
28 SUBJECT WAS PREVIOUSLY A HOTEL.

1          (g)   The Ex. No. 31, page 2 states that the "Owner of

2   Public Record," is "S-BAY DEVELOPMENT LLC," and "CONTRACT IS

3   BETWEEN DC705JV, THE SELLER, AND THE PURCHASER DEBRA A REID ON

4   06/28/2006."

5          153.   In the Appraisal Report (Ex. No. 31, page 3), in

6   response to the question: "Describe all common elements and

7   recreational facilities," the appraiser states: "SWIMMING POOL,

8   CABANA BAR, MARINA WITH GULF ACCESS, COMMON AREAS." And the

9   appraiser states "YES" to the question: "Are the parking facilities

10  adequate for the project size and type?" The Appraisal was false in

11  the properties identified as "common elements" were not common

12  elements and were not to be owned in common.

13         154.   The Appraisal Report (Ex. No. 31, page 4), provided

14  comparable units of those sold in the Cay Club development itself

15  and one other unit, and again identified "Common Elements

16  Recreations Areas" "POOL/CLUBHOUSE COMMON AREAS," with the

17  appraiser's signature on Ex. No. 31 (page 5), and photographs of

18  the units (indicating two story, twenty-year old apartment

19  buildings, at Ex. No. 12, pages 6, 7, and 8), which show a single

20  hotel room unit of 13.5 by 22.5 feet, with a bathroom included (a

21  total of 303.75 square feet), which is being appraised at and

22  purchased for (Ex. No. 12, page 4) $286,000.00.

23         155.   The Appraisal Report (Ex. No. 31, pages 9, 10 and

24  11), show "Additional Site Photos," which include "Boat Dock, Dry

25  Boat Storage, Exercising and Pool Area."

26         156.   The Appraisals were directed to be created by the

27  P&O DEFENDANTS.  It was the P&O DEFENDANTS that hired the

28  appraisers, directed the appraisers, provided information to the

---

**COMPLAINT NO. 3**

1   appraisers which they knew was false and fraudulent, and which they
2   knew that the plaintiffs would rely.

3        157.   The P&O DEFENDANTS intended the appraisals to be
4   false, and intended that the plaintiffs rely upon the appraisals as
5   an inducement of the plaintiffs to enter into the twenty seven (27)
6   purchase and sale agreements to purportedly purchase condominiums,
7   (which were not condominiums) with the reliance that the plaintiffs
8   would have an entitlement to what the appraisals identified as
9   "common elements."

10        158.   The P&O DEFENDANTS also directed the appraisals to
11  use re-addressed appraisals, that is appraisals for one unit was
12  used for another unit, based upon false information provided by the
13  P&O DEFENDANTS.

14        159.   The appraiser aided and abetted the RICO scheme and
15  the fraudulent scheme.   The appraiser committed fraud in that the
16  appraiser knew that the appraisal information was false.   In the
17  alternative the appraiser committed negligent misrepresentation, in
18  that the appraiser had no reasonable grounds for believing that the
19  appraisal was true.   The appraiser was negligent in that the
20  appraiser did not comply with the standards of conducting an
21  independent appraisal.

22            **THE NATURE OF THE TRANSACTION - COLONIAL BANK**

23        160.   On April 28, 2005, a Florida entity, S-Bay
24  Development, LLC purchased the 4.453 acre first parcel.

25        161.   On April 28, 2005, S-BAY, LLC also purchased the
26  second property, the "Sara Bay Marina."

27        162.   S-BAY, LLC financed the purchase of the two
28  parcels, No. 1 for $10 million, and No. 2 for $6.230 million (total

1   $16.230 million), by borrowing more than the purchase price from

2   Colonial Bank.

3          163.   The April 28, 2005 Mortgage in favor of COLONIAL

4   BANK, however, does not identify a condominium conversion, or

5   release prices.

6          164. On September 1, 2005, attorney W. Scott Callahan, of

7   Stump, Storey Callahan, Dietrich & Spears P.A., 37 North Orange

8   Avenue, Suite 200, Orlando Florida 32801, created an eighty-eight

9   (88) page "Declaration of Covenants Restrictions and Easement for

10  Sarasota Cay Club Resort" (Ex. No. 21), recorded "BK 2078 PG 2405

11  DKT # 2231233."

12         165. Attached as Exhibit No. 32 is the face page and

13  pages 84 and 85 (with enlargements of page 84 and 85) of the W.

14  Scott Callahan Esq. Stump, Story, Callahan , Dietrich & Spears

15  created Declaration of Covenants Restrictions and Easements For

16  Sarasota Cay Club Resort.  Ex. No. 32 Page 84 identifies the

17  "Condominium Lot Legal Description."  Ex. No 32 Page 95 identifies

18  the "Non-Condominium Lot Legal Description."  The lot description

19  on Page 84 is identical to the lot description on page 85.   The

20  CC&Rs of the "Sarasota Cay Club Resort," not the Cay Club

21  Condominium (in that there were none identified for the Cay Club

22  Condominium, identify the "Condominium property" and the "non-

23  condominium property," as identical.  This fact further supports W.

24  Scott Callahan and Sump, Story, Callahan as aiders and abetters in

25  the RICO scheme who conspired with the OWNER and PROMOTER PARTIES.

26         166.   Exhibit No. 24, dated January, 2006, represents:

27                 "...Properties throughout the state of Florida
                   with comparables to the Sarasota Cay club are
28                 coming in between $879 and $2012 a square foot!

---

Preconstruction pricing at Sarasota Cay Club is
still under $450.00 per sq. foot... ."

167. The representation was created by the P&O DEFENDANTS
(Ex. No 33). The true facts were that: "properties throughout the
state of Florida with comparables to the Sarasota Cay Club (**were
not**) coming in between $879 a square foot to $2,012 a square foot."

168. The true facts were that **there was no**
"preconstruction pricing at Sarasota Cay Club ..under $450.00 a
square foot," in that there was no plans submitted to undertake any
further construction.

### THE FINANCING DEFENDANTS

169. The P&O DEFENDANTS had a business relationship with
Ross Pickard and the Pickard Group. The P&O DEFENDANTS directed the
plaintiffs to finance their purchase through Ross Pickard of the
Pickard Group.  Ex. No 34 (page 3) identifies Ross Pickard of the
Pickard group as "Ross Pickard, Senior Loan Office The Pickard
Group JP Morgan Chase."

170. Ex. No 34 (page one) identifies The Pickard Group
"JP Morgan Chase," as providing seminars for sales and advertising
in which the Sarasota Cay Club was advertised and promoted.

171. Of the three lending institutions named in the
complaint, JP MORGAN CHASE, National City, and FIFTH THIRD, all
loans by CHASE and FIFTH THIRD were provided by P&O DEFENDANTS
and PROMOTER parties and the OWNER PARTIES referred all of the
plaintiffs to the Ross Pickard and the Pickard Group who obtained
loans for all plaintiffs most by JP MORGAN CHASE, and others by
National City and Fifty Third.  The Pickard Group and Ross Pickard
and J. P Morgan Chase was identified as preferred lenders by the
MARKETING, PROMOTER and OWNER parties.

S:\Shared Data\PC7\Sarasota Cay Club\COMPLAINT NO. 3a.wpd

172. None of the plaintiffs had ever known of Ross Pickard or the Pickard Group or National City previously.

173. National City was a broker that also represented JP MORGAN CHASE and Ross Pickard and National City were recommended and preferred brokers of the PROMOTIONAL and OWNER PARTIES.

174. In providing the loans to the plaintiffs Ross Pickard and the Pickard group and National City provided  assisted to each of the plaintiffs in completing their loan applications.

175. During 2006 and 2007 in completing the plaintiffs loan applications, Ross Pickard and The Pickard Group personnel and National City represented to the plaintiffs that they were purchasing a condominium, that the investment was an excellent opportunity.

176. Plaintiffs allege on information and belief that Ross Pickard and the Pickard Group, and National City received special commissions from the MARKETING and OWNER Parties for completing loan applications.

177. Ross Pickard and the Packard Group and National City had sufficient information and familiarity with the Sarasota Cay Club to know that no condominiums were being provided, knew of the fraud being committed by the Sales and Marketing parties and the owner parties or had grounds to know.

178. Ross Pickard and the Pickard Group and National City allowed the Marketing Parties and the Owner Parties to select the appraisers and direct the appraisers, and knew that the Marketing Parties and the Owner Parties, were advertising and marketing the appraisals to induce the plaintiffs to finance and purchase the

1 units, which was a violation of all FDIC and Controller of the

2 currency regulations with regard to appraisals.

3 <u>**THE HUD SETTLEMENT STATEMENT**</u>

4       179. Attached as Exhibit No. 35, is a typical "U.S.

5 Department of Housing And Urban Development Settlement Statements,"

6 for the sale of the SCC-LLC-FL condominium units. Exhibit No. 35

7 identifies:

8       (a)   The "Settlement Statement" ("SS") is prepared by

9 defendant, the law firm, Stump, Callahan, Dietrich & Spears

10 ("SCDS"), 37 North Orange Ave., Suite 200, Orlando, Florida 32802

11 and identifies an "Escrow File Number;"

12       (b)   The Borrower on the attached SS is "Efy Tal;"

13       (c)   The name of the seller is DC705 JV, LLC, "located at

14 16187 US Highway 19, Suite 500 Clearwater, FL 32802;"

15       (d)   The "Lender" is "JP Morgan Chase Bank 4919 Memorial

16 Highway Suite 100, Tampa, FL 33634;"

17       (e)   Line 502 identifies "Settlement Charges to Seller"

18 of $15,065 (a payment to a non-party, who is not identified);

19       (f)   Line 603 identifies "Cash" to Seller, $69,501.68.

20       180. Attached as Exhibit No. 36 is the Lori A. Waller

21 Settlement Statement, for a contact sales price of $328,0550 and

22 includes:

23       (a)   "502 Settlement charges to Seller $15,065.00"

24 (again, payment to a non-party who is not disclosed);

25       (b)   "603 Cash to Seller $102,508.46;"

26       (c)   "506 Release Price to Birdman $170,049.60," who is

27 not a seller.

28

181.  On informational belief, during the period 2005 to 2007, the purchase of the 130 units provided <u>at a minimum</u> <u>$37,000,000.00</u> for the units with none of the units including the common areas.  <u>Approximately $13.5 million was paid out of escrow</u> <u>to third parties, whose identities are unknown.</u>

**I.**

**FIRST CLAIM FOR RELIEF**

**Violation of Federal Securities Laws, Securities Act of 1933(2)(1),**

**15 U.S.C. 77(b)(1), Securities Exchange Act of 1934 3(a)(10 15),**

**U.S.C.A. 78(c)(a)(10)**

182.  Plaintiff reincorporate each and every allegation as set forth in this complaint in Paragraphs Nos. 1 through 181 as fully set forth in this paragraph.

**THE PURCHASE AND SALE OF "SECURITIES" UNDER THE**

**1933 AND 1934 SECURITIES ACT**

183. PLAINTIFFS allege that the representations of the P&O DEFENDANTS were made in connection with the purchase and sale of a "security," as that term is defined by both section 2 of the Securities Act of 1933, 15 U.S.C. § 77b(1) (1982), and section 3 of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(1)(10) (1982). Both 15 U.S.C. § 77b(1) and 15 U.S.C. § 78c(1)(10), define the term "security" to include any "investment contract."

184. The term "investment contract" has been interpreted to reach "[n]ovel, uncommon, or irregular devices, whatever they appear to be ..." <u>SEC v. C.M. Joiner Leasing Corp.</u>, 320 U.S. 344, 351, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943).  As set forth in <u>SEC v.</u> <u>W.J. Howey Co.</u>, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the "investment contract" definition:

1      "...embodies a flexible rather than a static
       principle, one that is capable of adaptation to
2      meet the countless and variable schemes devised
       by those who seek the use of the money of
3      others on the promise of profits." Id. at 299.

4          185. In Howey, supra, the Supreme Court found that the

5   combined sale of land and a land service contract, under which the

6   purchaser relinquished all control over the land for a 10-year

7   period, was an investment contract.   The Court held:

8      "...[A]n investment contract for purposes of
       the Securities Act means a contract,
9      transaction or scheme whereby a person invests
       his money in a common enterprise and is led to
10     expect profits solely from the efforts of the
       promoter or a third party, it being immaterial
11     whether the shares in the enterprise are
       evidenced by formal certificates or by nominal
12     interests in the physical assets employed in
       the enterprise." (emphasis added) Id. at 298-
13     99, 66 S.Ct. at 1103.

14         186. PLAINTIFFS assert that the purchase and sale

15  agreements, which included the mandatory leaseback agreements, were

16  "investment contracts," under 15 U.S.C. § 77b(1) and 15 U.S.C.

17  78c(1)(10), in that they constituted: (1) an investment of money,

18  (2) in a common enterprise, (3) with an expectation of profits

19  produced by the efforts of others. Howey, supra, at 298-299.   In

20  Howey, supra, as here, the PLAINTIFFS purchased real estate and at

21  the same time relinquished the right to use or enter the property.

22  Id., at 328 U.S. at 296, 66 S.Ct. at 1101.

23         187. The PLAINTIFFS in this case were obligated to enter

24  into leaseback contracts, and the PLAINTIFFS were generally

25  nonresidents who lacked the skill, knowledge and equipment

26  necessary to manage the investment. Howey, supra at 296, 66 S.Ct.

27  at 1101.

28  ///

188. PLAINTIFFS allege the defendants had promised, along with the land sales, to develop the community.  Each of the PLAINTIFFS purchased an interest not only in real property but also a package of commitments that, taken together, comprised a business venture harnessing the entrepreneurship of the defendants, whose commitment to build the community, in turn, constituted the 'common enterprise' financed jointly by the PLAINTIFFS, and which representations played a significant role in the purchase of the units.

189. Finally, PLAINTIFFS further allege that without the substantial improvements pledged by the P&O DEFENDANTS, the units clearly would not have a value consistent with the price which PLAINTIFFS paid.

190. The Securities and Exchange Commission has long recognized the securities laws' potential applicability to sales of condominiums for investment.  In 1973, the SEC issued a release in order to "alert persons engaged in the business of building and selling condominiums ... to their responsibilities under the Securities Act and to provide guidelines for a determination of when an offering of condominiums or other units may be viewed as an offering of securities." Offers and Sales of Condominiums or Units in a Real Estate Development, Securities Act Release No. 33- 5347, 1 Fed.Sec.L.Rep. (CCH) ¶ 1049 (Jan. 4, 1973) (listed at 17 C.F.R. § 231.5347 (1988)).  Release 5347 puts developers and promoters on notice of three situations which the SEC views as involving the offering of a security, including "[t]he offering of participation in a rental pool arrangement."

///

191. In defining the term "investment contract," <u>Howey</u> itself uses the terms "contract, transaction or scheme," 328 U.S. at 298- 99, 66 S.Ct. at 1103, leaving open the possibility that the security not be formed of one neat, tidy certificate, but a general "scheme" of profit seeking activities. Such a "scheme" cannot be fully assessed by examining only those items a broker was legally authorized to offer an investor. Similarly, it is worth noting that the term "offer" has a different and far broader meaning in securities law than in contract law. <u>Diskin v. Lomasney & Co.</u>, 452 F.2d 871, 875 (2d Cir.1971) (Friendly, J.); <u>SEC v. Commercial Inv. & Dev. Corp. of Florida</u>, 373 F.Supp. 1153, 1164 (S.D.Fla.1974) (finding a newsletter stressing the importance of shareholders' soliciting others was "offer to sell"). The items were presented by the defendants, and each of them, to the PLAINTIFFS as part of the same transaction or scheme, and PLAINTIFFS purchased them as such.

**FACTUAL ELEMENTS UNDERLYING THE DEFENDANTS' SECURITIES VIOLATIONS**

192. PLAINTIFFS entered into agreements for the purchase and sale of their individual units.

193. The misrepresentations included, among other matters:

(1) That the PLAINTIFFS' property was a condominium, which it was not;

(2) That the PLAINTIFFS' property would be developed from the funds used in purchase;

(3) That the development intended to build numerous improvements on the property;

///

(4)   That the development would invest $25,000.00 per unit at a minimum in upgrading each unit; and

(5)   That the sellers would create a vacation resort, and investments had been made to that end.

194. PLAINTIFFS solely depended upon the defendants to maintain or increase the value of their property as promised, and were solely dependent upon managerial skills to maintain and increase the value of their property, and/or maintain the value of their property.

195. The P&O DEFENDANTS' misrepresentations were made in connection with the purchase or sale of the PLAINTIFFS' units.

196. The contract for the purchase and sale of the units, coupled with the mandated lease back agreement, and the membership agreement, required the PLAINTIFFS to release all control over the property, for a period of a minimum of two years.

197. The PLAINTIFFS invested their money in a common enterprise.

198. The PLAINTIFFS lacked the skill and knowledge necessary to manage their respective investments.

**VIOLATIONS OF THE 1933 AND 1934 SECURITIES ACT**

199. The P&O DEFENDANTS violated the 1933 and 1934 Securities Acts by, among other matters, undertaking the following:

(a)   The P&O DEFENDANTS offered to sell, and sold, securities in interstate commerce without the required registration statements to be filed with the SEC, in violation of 15 U.S.C. §§ 77e(a) and 77e(c);

(b)   The P&O DEFENDANTS, in the offer to sell, and in the sale of the securities, violated 15 U.S.C. §§ 77q(a) by creating

1  the devices, schemes and artifices in order to defraud the

2  PLAINTIFFS by not providing the property they promised to convey

3  without a cloud on title, obtained money from the PLAINTIFFS and

4  the common elements by means of materially false and misleading

5  statements; and the defendants' transactions, practices and courses

6  of business operated as a fraud and deceit;

7  (c)   The P&O DEFENDANTS, in the offer to sell, and in the

8  sale of the securities, violated 15 U.S.C. Section 78j(b) and 17

9  C.F.R. Section 240.10b-5 by committing fraud in connection with the

10  PLAINTIFFS' purchase and sale transactions, by (1) not conveying

11  the property they promised to convey without a cloud on title,

12  employing a manipulative and deceptive device, (2) by making untrue

13  statements of material fact, and (3) by engaging in acts, practices

14  and courses of business which operated or would operate as a fraud

15  or deceit upon any person; and

16  (d)   The P&O DEFENDANTS, in the sale of the securities,

17  violated 15 U.S.C. Section 78o(a), by selling securities without

18  being registered with the SEC.

19  200. The PLAINTIFFS seek rescission, and restitution and

20  attorneys' fees against the P&O DEFENDANTS.

21  201. To the extent that any of the PLAINTIFFS no longer

22  own and/or have sold the units they purchased, those PLAINTIFFS do

23  not seek rescission, but do seek all other remedies available to

24  them, including, but not limited to, restitution, restoration of

25  their credit status, and punitive damages.

26  ///

27  ///

28  ///

## II.

## SECOND CLAIM FOR RELIEF

## Violation of the Interstate Land Sale Act 15 U.S.C. 1701

202. PLAINTIFFS reallege each and every allegation as set forth in this complaint in Paragraphs Nos. 1 through 181 as if fully set forth in this paragraph.

203. The P&O DEFENDANTS unlawfully made use of means or instruments of transportation or communication in interstate commerce or in the mails with respect to the sale of a lot or lots at Sarasota Cay Club, which are not exempt under 15 U.S.C. 1702, without filing a statement of record with the Secretary of Housing and Urban Development in violation of 15 U.S.C. 1703(a)1(A) of the Interstate Land Sales Act.

204. The P&O DEFENDANTS unlawfully employed a device, scheme, or artifice to defraud the PLAINTIFFS in connection with the sale of a lot or lots at Sarasota Cay Club, which are not exempt under 15 U.S.C. 1702(a)2(A) of the Interstate Land Sales Act, and as a direct and proximate result of the P&O DEFENDANTS' fraudulent acts, PLAINTIFFS acted in reliance of such fraudulent representations and were significantly damaged.

205. As a result of the P&O DEFENDANTS' violations of 15 U.S.C. 1503 of the Interstate Land Sales Act, PLAINTIFFS are entitled to relief under 15 U.S.C. 1709 of the Interstate Land Sales Act, including but not limited to, damages, restitution, and all costs recoverable, including attorneys' fees.

///

///

///

# III.

## THIRD CLAIM FOR RELIEF

### Violation of the RICO Act

206. PLAINTIFFS reallege each and every allegation as set forth in this complaint in Paragraphs Nos. 1 through 181 as if fully set forth in this paragraph.

207. PLAINTIFFS allege that the P&O DEFENDANTS conspired among themselves and undertook acts in furtherance of their conspiracy to: (1) create an enterprise, that of the (a) creation and sale of real estate interests, (b) for the purpose of falsely promoting the sale of the real estate interests, for (c) the purpose of defrauding the buyers who would purchase the real estate interests; (2) and through a pattern of such activities of the enterprise; (c) engaged in a pattern of (4) racketeering activities (that is predicate acts), of (5) (a) interstate mail fraud, and (b) interstate wire fraud, causing (6) injury to the PLAINTIFFS.

208. The P&O DEFENDANTS undertook to enter into a conspiracy and undertook acts as follows:

(a) In April, 2005, the P&O DEFENDANTS purchased real property with upwards of 140 rental units, four buildings, on 4.453 units, with 3.5 undeveloped acres and the "Sara Bay Marina";

(b) In 2004 and 2005, in investment seminars in many states, and in documentation provided to potential purchasers, the P&O DEFENDANTS, in interstate commerce, promoted the sale of the individual rental units as condominium units, and falsely and fraudulently represented that the P&O DEFENDANTS would provide income and appreciate to the PLAINTIFFS purchasers by developing the shared facilities, commercial unit, upgrading the units, and

1 | required the PLAINTIFFS buyers to lease back the condominiums to
2 | the P&O DEFENDANTS.

3 |      209. The P&O DEFENDANTS represented that the P&O
4 | DEFENDANTS would utilize funds received from the sale of the
5 | individual units and other funds to develop the shared facilities,
6 | commercial unit, by providing a hotel, conference rooms,
7 | restaurants, and other improvements, and would utilize the funds
8 | received to greatly improve each unit purchased, would invest in
9 | and improve the common elements and would manage the development
10 | which would result in an appreciation of the value of the
11 | individual condominium units and income stream from the rental of
12 | the units as a hotel.

13 |      210. In furtherance of the enterprise, the P&O
14 | DEFENDANTS, through fraud and deceit, as to the intentions of
15 | developing a resort complex based upon the PLAINTIFFS' investment
16 | of their funds to purchase units in the complex, had the PLAINTIFFS
17 | join the Sarasota Cay Club, agree to purchase units and lease back
18 | their units, with no intention to utilize the funds from the sale
19 | of the units or any other funds to upgrade the units, or the common
20 | areas, or to create a resort property.

21 |      211. In furtherance of the enterprise, the P&O
22 | DEFENDANTS, without proper notice to the PLAINTIFFS, reserved what
23 | was identified as "shared facilities, commercial unit 4.44 acres"
24 | to the P&O DEFENDANTS, when such "shared facilities, commercial
25 | unit," should have been classified as "limited common elements,"
26 | for the benefit of development of the resort community.

27 |      212. In furtherance of the fraudulent scheme, the P&O
28 | DEFENDANTS conspired among themselves, and possibly with others to

---

**COMPLAINT NO. 3**

S:\Shared Data\PC7\Sarasota Cay Club\COMPLAINT NO. 3a.wpd

1  cause funding of each purchase, other than those payments made out

2  of escrow for payment to COLONIAL to pay off the initial $17.6

3  million debt, to cause the escrow agent, defendant Stump Storey

4  Callahan Dietrich & Spears, to pay out of each purchase, funds to

5  other DEFENDANTS that had no lien or right to receive such funds.

6  Out of the 121 sales made, each sale resulted in a payment of

7  upwards of 50% to 60% of the funds paid by the financial

8  institution lender, to be paid out of escrow to persons or entities

9  that had no encumbrance on the land, or buildings. Escrow also

10  illegally paid funds for services that were not provided in the

11  sale, or paid funds designated as development fees that were not

12  owing.

13      213. The P&O DEFENDANTS, in conspiracy with others,

14  engaged in a pattern of such conduct over a period of 2004 to the

15  present, both in Las Vegas, Nevada, Clearwater, Florida, Orlando,

16  Florida, Sarasota, Florida, and in other communities in Florida,

17  and through such pattern of activity caused damage to the

18  PLAINTIFFS.

19      214. On November 20, 2008 Colonial Bank recorded a Lis

20  Pendens against the subject property and the adjacent adjoining

21  Marina.  On March 26, 2009, Colonial Bank assigned it's rights

22  under said mortgage to SBM with a total outstanding balance on said

23  mortgage of $22,698,243.81 (more than the total indebtedness) SBM

24  then assigned their rights to DBM Commercial on May 29, 2009.   DBM

25  retains ownership of all the "common element" and the Marina.   The

26  Plaintiffs are seeking a reversal of the transaction.

27      215. PLAINTIFFS request treble damages of all of

28  PLAINTIFFS' purchases as a result of fraud, and that the DEFENDANTS

be held liable for the damages caused to the PLAINTIFFS, and that the Court impose a constructive trust on the assets of the DEFENDANTS to provide restitution for the PLAINTIFFS.

## IV.

### FOURTH CLAIM FOR RELIEF

### Fraud (Intentional Misrepresentation)

216. PLAINTIFFS reallege each and every allegation as set forth in this complaint in Paragraphs Nos. 1 through 181 as if fully set forth in this paragraph.

217. The entire basis of PLAINTIFFS entering into the purchase and sale agreements and the loan agreements, among other agreements, was based upon fraud and the P&O DEFENDANTS' intent to commit fraud and intent to commit deceit through the failures to disclose.

218. PLAINTIFFS and each of them are entitled to compensatory damages, resulting from each of their agreements, and entitled to restitution as to all funds paid plus pre-judgment interests, and are entitled to an order of this Court providing a restoration of their credit status.

219. The P&O DEFENDANTS' conduct was fraudulent, despicable and malicious and the PLAINTIFFS are entitled to an award of punitive damages.

## V.

### FIFTH CLAIM FOR RELIEF

### Fraud (Concealment)

220. PLAINTIFFS reallege each and every allegation as set forth in this complaint in Paragraphs Nos. 1 through 181 as if fully set forth in this paragraph.

221. The entire basis of PLAINTIFFS entering into the purchase and sale agreements and the loan agreements, among other agreements, was based upon fraud of the P&O DEFENDANTS' intent to commit fraud and intent to commit deceit through the failures to disclose.

222. PLAINTIFFS and each of them are entitled to compensatory damages, resulting from each of their agreements, and entitled to restitution as to all funds paid plus pre-judgment interests, and are entitled to an order of this Court providing a restoration of their credit status as of the agreements for the purchase and sale which are void ab initio.

223. PLAINTIFFS seek damages, and an order restoring their adverse credit reporting, pending the resolution of this case.

224. The P&O DEFENDANTS' conduct was fraudulent, despicable and malicious and in the alternative the PLAINTIFFS are entitled to an award of punitive damages.

## VI.

### SIXTH CLAIM FOR RELIEF

### Conspiracy To Commit Fraud

225. PLAINTIFFS reallege each and every allegation as set forth in this complaint in Paragraphs Nos. 1 through 181 as if fully set forth in this paragraph.

226. The P&O DEFENDANTS made misrepresentations that they did not intend to fulfill.

227. The P&O DEFENDANTS, upon the PLAINTIFFS entering into the agreements and contracts, had a fiduciary relationship

1   which required them to disclose all material facts which they did

2   not disclose.

3          228. The P&O DEFENDANTS committed deceit, through

4   intentional misrepresentations and failures to disclose.

5          229. PLAINTIFFS seek damages in an amount to be proven at

6   trial.

7          230. The P&O DEFENDANTS' conduct was fraudulent,

8   despicable and malicious and the PLAINTIFFS are entitled to an

9   award of punitive damages.

10                                **VII.**

11                      **SEVENTH CLAIM FOR RELIEF**

12                          **Constructive Trust**

13         231. PLAINTIFFS reallege each and every allegation as set

14   forth in this complaint in Paragraphs Nos. 1 through 181 as if

15   fully set forth in this paragraph.

16         232. PLAINTIFFS allege that the P&O DEFENDANTS  committed

17   fraud and engaged in acts of fraudulent transfers and money

18   laundering through interstate commerce by creating false documents

19   indicating the existence of loans between these interrelated

20   companies, laundering funds or transferring funds to fraudulently

21   avoid creditors.

22         233. PLAINTIFFS request that the Court impose a

23   constructive trust as to the funds received by the P&O DEFENDANTS

24   for the benefit of the PLAINTIFFS and the financial institutions,

25   freeze and find that the DEFENDANTS hold their assets in

26   constructive trust for the PLAINTIFFS for purposes of restitution.

27   ///

28   ///

1    WHEREFORE, PLAINTIFFS demand:

2        1.    For damages;

3        2.    An order requiring restitution as to all funds paid

4    and expended, in favor of all PLAINTIFFS;

5        3.    An order awarding reasonable attorneys' fees and

6    costs;

7        4.    A preliminary and permanent injunction to preclude

8    all foreclosures and adverse credit reporting and a mandatory

9    injunction to withdraw all adverse credit reporting as to each

10   plaintiff;

11       5.    For punitive damages;

12       6.    For a determination of PLAINTIFFS' rights and

13   remedies against defendants CLTI and SSCD&S;

14       7.    For appointment of a master or receiver;

15       8.    For treble damages under RICO;

16       9.    For costs of suit; and

17       10.   For such other and further relief as the Court may

18   deem appropriate and necessary under the circumstances.

19

20       Respectfully Submitted,

21       LAW OFFICES OF ALLEN HYMAN

22

23   DATED: May _16_, 2011        By: _____

24       Allen Hyman, Esq.
    Attorneys for Plaintiffs

25

26

27

28

1    ## DEMAND FOR JURY TRIAL

2            Pursuant to F.R.C.P. Rule 38, PLAINTIFFS request a trial

3    by jury.

4

5                                    Respectfully Submitted,

6                                    LAW OFFICES OF ALLEN HYMAN

7

8    DATED: May _16_, 2011        By: _____

9                                    Allen Hyman, Esq.
                                     Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28